**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IMAM MAHMOOD AHMAD, individually and in his official capacity as Imam of the Masjid Isa Ibne Maryam, a religious house of worship, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| KATHLEEN JENNINGS, ATTORNEY GENERAL OF THE STATE OF DELAWARE, JOSETTE D. MANNING, SECRETARY OF THE DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, STEVEN BLESSING, DIRECTOR OF DELAWARE'S DIVISION OF PUBLIC HEALTH, SHAUNA SLAUGHTER, ACTING DIRECTOR OF THE DIVISION OF PROFESSIONAL REGULATION OF THE DEPARTMENT OF STATE OF THE STATE OF DELAWARE, in their official capacities, AND ANDREW PARSELL, PRESIDENT OF DELAWARE'S BOARD OF FUNERAL SERVICES, NICHOLAS PICOLLELLI, SECRETARY OF DELAWARE'S BOARD OF FUNERAL SERVICES, AND EVAN W. SMITH, WILLIAM TORBERT, ALISHA FLETCHER, LAURA WILLEY AND VANCE DANIELS, MEMBERS OF DELAWARE'S BOARD OF FUNERAL SERVICES, in their official and personal capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | |

C.A. No. _____

**Electronically Filed**

**[JURY TRIAL DEMANDED]**

**COMPLAINT FOR VIOLATION OF FEDERAL AND STATE**
**CONSTITUTIONAL AND CIVIL RICHTS**

Plaintiff Mahmood Ahmad, individually and in his official capacity as Imam of the

Masjid Isa Ibne Maryam, a religious house of worship, by and through his undersigned counsel,

based on personal knowledge of his own acts and events witnessed by him, and upon information

and belief based on investigation of counsel as to all other matters, hereby states and alleges as follows:

## **INTRODUCTION**

1.      This is an action for declaratory and injunctive relief to protect fundamental guarantees of religious freedom and equal protection under the United States and Delaware Constitutions, for damages to compensate for violation of such rights, and for an award of attorneys' fees as provided for under federal statutory law.

2.      Plaintiff brings suit to preserve and restore the historical right of clergy to conduct religious burial and funeral rites, and of members of his congregation (as well as other Muslim congregations for which Plaintiff provides such rites and burials) to receive and participate in them, free from interference and harassment by the State of Delaware and the members of its Board of Funeral Services (the "Board"). In connection with the matters described herein, the Board's actions serve no health or safety interest, but instead, serve the commercial interests of the Board's licensees. The Board's members have used and currently are using the power and authority granted to them under Delaware's Funeral Director Law (the "Delaware FDL") and ceded to them by the Director of Delaware's Division of Public Health and State Registrar of Vital Statistics under its Public Health laws, to create a discriminatory and anticompetitive barrier at hospital morgues and other locations, refusing access to the remains of deceased Delawareans who practiced Islam, unless those seeking to lay them to rest in the Muslim tradition pay a licensed funeral director thousands of dollars just to file routine paperwork required under Delaware law for a lawful burial.

3.      Plaintiff faces an untenable situation because, to avoid such exploitation by becoming a licensed funeral director himself, Delaware law requires that Plaintiff engage in

embalming of human remains, which is forbidden by core tenets of Islam. Put otherwise, Delaware law requires Plaintiff to sacrifice his sincerely held religious beliefs if he wishes to avoid exploitation by licensed funeral directors by becoming licensed himself.

4.     Additionally, Plaintiff is now under investigation and threat of enforcement by the Delaware Division of Professional Regulation as the result of a complaint lodged by a Board member or a Delaware-licensed funeral director (with the knowledge and assistance of one of more Board members) for no reason other than to protect their commercial interests. Tellingly, the complaint was lodged within days after the Board's March 21, 2023 meeting, at which it received reports that Plaintiff was seeking, through Delaware State Senator Bryan Townsend, to introduce proposed legislation granting clergy an exemption from current law restricting access to DelVERS to licensed funeral directors.  Concerned that such an exemption "would eliminate all power of the board," the Board used its authority under Delaware law improperly to initiate state enforcement action, with potential criminal penalties, against the non-profit entity through which Plaintiff had been conducting the funerary activities of the Mosque, because Plaintiff dared to seek legislation threatening the Board's monopolistic power.

5.     Plaintiff seeks only to practice the funerary rituals of Islam without restriction and undue financial burden imposed by Defendants under color of state law. As a matter of religious obligation and exercise, Plaintiff offers Muslims in Delaware traditional funeral services consistent with the Islamic tradition on a charitable basis. Current enforcement of the Delaware FDL by the Board and the Division of Public Health's discriminatory denial of access to the online DelVERS system, which is the exclusive means of obtaining death certificates and permits for the transportation and burial of human remains ("Burial-Transit Permits), violates

Plaintiff's constitutional civil rights with respect to religion and denies him equal protection of the laws.

6.      The nature of Defendants' constitutional violation is easily explained.  To lawfully transport and bury human remains in Delaware, Plaintiff must obtain a burial-transit permit. However, only licensed funeral directors are authorized to use Delaware's online system, known as DelVERS, to file a death certificate and thus obtain the burial-transit permit. Muslims cannot become licensed funeral directors in Delaware without sacrificing their sincerely-held religious belief that embalming human remains is a sacrilegious desecration of the human body. The Delaware FDL requires training and education in embalming, including an internship that requires the licensure applicant to perform 25 human embalmings. There is no exception, under the statute, for religious beliefs and practices that differ, although Delaware regulations (described *infra*) establish a system of individualized exemptions. Because Muslims cannot become licensed funeral directors, they must rely on a Delaware–licensed funeral director to obtain the burial transit permit. Plaintiff does not require any services from the licensed funeral director other than obtaining the permit. However, with few occasional exceptions, the Delaware-licensed funeral directors refuse to provide "permit only" service, or if they do, charge hundreds or even thousands of dollars just to obtain a single permit. If Delaware law permitted Muslims to become licensed funeral directors without sacrificing their sincerely held religious beliefs concerning embalming, Plaintiff and his congregants would not be subject to such exploitation and economic harm, which severely burdens the free exercise of their religion.

7.      Ironically, the Board was created, according to the Delaware FDL, primarily to protect public funeral services consumers from the pervasive anticompetitive practices of the funeral director industry, and, ostensibly to protect Delawareans from purported health risks.  In

4

practice, however, the statute's stated purposes are only a pretext. The Board selectively applies the Delaware FDL and controls access to the DelVERS system, without cause or legal basis, to capture and maintain a lucrative revenue stream for its licensees.

8.      The 2020 U.S. Census did not separate Muslims among ethnicities in Delaware, but the Pew Research Center says about 1% of the state's population is Muslim, which would be about 10,000 people. Funeral home prices in Delaware for a single service/burial run from several thousand to over ten thousand dollars--substantially higher than the national average. That's a multi-million dollar market, threatened by the prospect of the free exercise of Delaware Muslims' religion. Viewed from this perspective, it is not surprising that Delaware Vital Statistics administrators denied Imam Mahmood access to the DelVERS online filing system, and directed him to talk to the Board of Funeral Services if he wanted to obtain death certificates and burial-transit permits. The state officials who administer access to DelVERS under the authority of Defendant Blessing as Director of the Division of Public Health and State Registrar of Vital Statistics improperly report to and act based on instructions from the Board to preserve its monopoly. Defendants' conduct is consistent with a long history of similar anticompetitive conduct by the commercial funeral industry and captive state regulatory boards across the United States.

9.      The funeral services and burials performed by Plaintiff are swift, modest, and simple, in accordance with Muslim traditions practiced for thousands of years. They involve direct transportation of the decedent's remains to the Mosque in Newark, a simple cleansing and shrouding of the remains in a room dedicated for that purpose, and a short prayer service, followed by transportation to a dedicated Muslim Cemetery in Middletown for burial. The entire process, from when the remains are removed from the place of death to the completion of the

burial, is virtually always completed within 5 to 6 hours. Only Imam Mahmood, one or two assistants, and a few family members and friends are involved. Unlike traditional American funerals, there is no extended "viewing" of the remains; at most, Plaintiff will accommodate a family request to view the deceased for a matter of minutes to say their personal goodbyes.

10.     Not coincidentally, Plaintiff's traditional Muslim funeral practices pose no incremental risk to public health. As alleged below, Imam Mahmood has university-level education in all of the matters within the scope of his duties as an Imam, including the public health aspects relating to the care and disposition of human remains, through Muslim institutions of higher learning, through course work undertaken in the United States both at Delaware Tech and at Mercer County Community College in Trenton, New Jersey. Imam Mahmood also has experience working with Faries Funeral Directors and Crematorium, Inc. ("Faries"), a Delaware funeral establishment run by a Delaware-licensed funeral director, during the Covid-19 pandemic, a time when funeral establishments applied universal precautions to reduce pathogen risks. Plaintiff Imam Mahmood is fully qualified to perform the traditional Muslim services and burials safely and expeditiously.

11.     Nor are the practices and guidelines followed by Muslim clergy in such matters at odds with Delaware law. For such prompt, direct burials, Delaware's public health laws and regulations require no embalming or refrigeration of the decedent's remains. Plaintiff Imam Mahmood has personally led hundreds of such services and burials over 3+ years of experience as an Imam. As a rule of practice, Imam Mahmood never takes possession of decedents' remains unless he is prepared to proceed promptly, within a matter of hours, to complete the service and burial that same day.  Further, because Imam Mahmood is not a licensed funeral director, he has

engaged a Delaware-licensed funeral director in order to obtain the Burial-Transit Permit required for each funeral in which he has been involved.

12.     Defendants have gone beyond simply denying Imam Mahmood access to the DelVERS system.  The Board has embarked on a campaign to shut down the Mosques' mission to provide traditional Muslim services and burials on a charitable basis.

13.     The Board:

- commenced an investigation of Delaware Muslim Funeral Home, Inc. ("DMFH"), the entity Plaintiff had used in connection with the Mosque's funerary activities, for "[p]racticing without a funeral establishment permit and a licensed funeral director," effectively asserting that Plaintiff may not conduct traditional Muslim funeral rites and burials unless supervised by a licensed Delaware Funeral director and unless part of the Mosque is dedicated to the sacrilegious practice of embalming;

- caused telephone calls to be made to ChristianaCare hospital morgues and medical records departments to alert them that Imam Mahmood is attempting to practice funeral directing without a license and that they should not release human remains to him . The hospital records departments were instructed to interrogate Imam Mahmood concerning where he planned to take released remains each time he shows up, and if he responds that he will take them to the Mosque instead of to a funeral establishment supervised by a licensed funeral director, then they should not release the remains to him. The hospital medical records departments have implemented these instructions, demonstrating the Board's involvement and its objectives in issuing these instructions;

- directed Division of Public Health Vital Statistics administrators to withhold access to DelVERS from Plaintiff Imam Mahmood when he applied as an administrator for limited licensee Christopher Coleman and his Pennsylvania funeral establishment, Distinguished Memorial Chapels, when the Board learned that Mr. Coleman had retained Imam Mahmood as an administrator to handle funerals for which Distinguished Memorial Chapels has agreed to assist the Mosque; and,

- on information and belief, threatened disciplinary action against any licensed funeral director or establishment that assists Plaintiff by charging nominal fees to obtain the necessary Burial-Transit permits.

This use of the State's police powers to restrain Muslim clergy for the benefit of professional funeral director licensees who seek only to profit is disturbing and unconstitutional.

14.     This action asserts that the State's application of its Public Health, Vital Statistics and the Delaware FDL to Plaintiff, as described herein, violates multiple provisions of the United States Constitution, including the First Amendment's promise of the free exercise of religion and the Fourteenth Amendment's guarantee of equal protection of the laws, the Delaware Constitution, and federal statutes forbidding violation of civil rights, and conspiracies to deprive civil rights. Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* Plaintiff seeks this Court's order declaring that the Delaware FDL and the Delaware Vital Statistics law may not be enforced to restrict Plaintiff's religious funeral practices, and that Plaintiff Imam Mahmood must be granted access to the Office of Vital Statistics DelVERS system for these purposes, without the need to engage the assistance of a Delaware licensed funeral director. Plaintiff also seeks compensatory damages, punitive damages, and an award of costs and reasonable attorneys' fees.

15.     This action is filed against the members of the State Board of Funeral Services in their individual and official capacities; the State's Attorney General, in her official capacity; the State's Cabinet Secretary for the Delaware Department of Health and Social Services, in her official capacity; the State's Director of the Division of Public Health in his official capacity; and the State's acting Director of the Division of Professional Regulation of the Department of State, in her official capacity.

## JURISDICTION

16.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's federal civil rights claims, which are made actionable by 42 U.S.C. § 1983. In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) because Plaintiff seeks to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. This Court also has original jurisdiction pursuant to 28 U.S.C. § l343(a)(4)

because Plaintiff seeks to recover damages and secure equitable relief under an Act of Congress that provides for the protection of civil rights. Declaratory relief is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65(a) of the Federal Rules of Civil Procedure.

17.     Plaintiff requests that the Court assume supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims arising under state law, including Plaintiff's claims under the Delaware Constitution.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 139l(b) because the events and occurrences herein alleged took place in part, among other locations, in New Castle and Kent Counties, in the District of Delaware.

## **PARTIES**

19.     Plaintiff Imam Mahmood Ahmed is the lead Imam at Masjid Isa Ibne Maryam, an Islamic religious house of worship (commonly referred to in this country as a "Mosque," and hereinafter referred to as the "Mosque") located in Newark, Delaware. As part of his ministry as lead Imam of the Mosque, Imam Mahmood performs the traditional Muslim funeral rituals and rites for deceased members of his religious community, as well as their associated transportation and burials. Imam Mahmood also is called upon to perform funeral rituals, rites and burials for other Mosques in Delaware, Pennsylvania, and Maryland. He has received extensive education and training in all matters coming within his duties as Imam, and, in accordance with Muslim law, this includes the foremost obligation of the protection of human life through proper funeral practices. Imam Mahmood is an American citizen born in Pakistan and raised in Queens, New York.  He graduated from Richmond Hill High School in Queens and earned 60 credits toward an aerospace technology degree from the State University of New York at Farmingdale. Thereafter, after successfully acquiring, running, and selling a transportation business in New

York, he determined to pursue his dream to study and devote his life to Islam, and moved his family to Saudi Arabia in 2004, remaining there until 2019.  He holds two Bachelor's Degrees from Umm Al-Qura University in Mecca, Kingdom of Saudi Arabia: first, in Arabic from the University's College of Arabic Language, and second, in Islamic Education, providing the foundation for his service as Imam at the Mosque.

20.     Defendant Kathleen Jennings, Esquire, is the Attorney General of the State of Delaware and as such is responsible for the enforcement of its laws and regulations.

21.     Defendant Josette D. Manning, Esquire, is the Cabinet Secretary for the Delaware Department of Health and Social Services, with authority over the division of Public Health and Delaware's Office of Vital Statistics.

22.     Defendant Steven Blessing is the Director of Delaware's Division of Public Health and State Registrar of Vital Statistics.

23.     Defendant Shauna Slaughter is the acting Director of the Division of Professional Regulation of the Department of State of the State of Delaware, which, through its Board of Funeral Services, has responsibility for the professional licensing of commercial funeral directors practicing in Delaware.

24.     Defendant Andrew Parsell is a Delaware licensed commercial funeral director and serves as the President of the Board.  He is one of the four Delaware-licensed commercial funeral directors who, by design of the Delaware FDL, comprise the Board's controlling majority.

25.     Defendant Nicholas Picollelli is also a Delaware licensed commercial funeral director, member of the Board majority, currently serves as its Secretary, and prior to being elected Secretary, was the Board's President.

10

26.     Defendant Evan W. Smith is a Delaware licensed commercial funeral director and a member of the Board's majority.

27.     Defendant William Torbert is a Delaware licensed commercial funeral director and a member of the Board's majority.

28.     Defendant Alisha Fletcher is a member of the "public" minority of the Board.

29.     Defendant Laura Willey is a member of the "public" minority of the Board.

30.     Defendant Vance Daniels is a member of the "public" minority of the Board.

## FACTS

**A.     The Mosque Offers Local Muslims the Option of a Traditional Muslim Service and Burial on a Non-Commercial Charitable Basis**

31.     Plaintiff Imam Mahmood Ahmad has served as Imam of the Mosque since 2020, after he returned to the United States from his studies in Saudi Arabia in 2019. He was recruited to become Imam at the Mosque by Dr. Navid Baqir, a member of the Delaware Muslim community and a leader among the Mosque's congregation.

32.     One of the Mosque's needs, which Imam Mahmood would address, was funerals for Muslim congregation members and for those of other local Muslim congregations. He found that the services offered by Delaware funeral establishments were very expensive, especially in view of the simplicity of traditional Muslim funeral practices, and the correspondingly limited nature of the services the funeral establishments were asked to perform. In virtually all cases, when his congregants opted to seek only the traditionally limited Muslim cleansing, shrouding, prayer and burial, the only services that the funeral establishments were asked to provide were filing the death certificate in order to obtain the burial-transit permit required by Delaware law to transport and bury the decedent's remains.

33.     He found Delaware funeral establishments quoted charges anywhere from $3,000 to $8,000 for these limited services, sometimes stating that they were charging what they referred to as a "non-declinable basic services fee." The Mosque's congregants paid these amounts, often with some assistance from the Mosque and members of the congregation. These fees presented a financial hardship to most families, and always come at a time of grief and loss.

34.      Imam Mahmood and the Mosque decided to offer traditional, non-commercial Muslim funeral services and burials, especially for Muslim families unable to afford the services of Delaware-licensed funeral directors and their funeral establishments.

35.     Islam mandates specific funeral rites as a matter of religious obligation. "Proper burial including salat al janazat is one of the 5 cardinal duties of brotherhood in Islam." Islamic Ethico-Legal Perspective On Embalming, Cryopreservation, Autopsy & Dead Corpse Research (Paper Presented at a training workshop on medical ethics at Nairobi on 26th July 2008 by Professor Dr Omar Hasan Kasule Sr. MB ChB (MUK), MPH (Harvard), DrPH (Harvard). The traditional Muslim rites include the ritual cleansing (Ghusl), shrouding, funeral prayer (salatul janazah), and burial in a dedicated Muslim cemetery. Muslims do not cremate, nor do they embalm their dead, which is considered "haram," *i.e.,* forbidden, as a desecration of the human body, which is sacred.  Islam is similar to orthodox Judaism and the Baha'i Faith in this respect. Instead, a simple burial of the shrouded body is performed. Islamic religious law calls for prompt ritual cleansing, shrouding, prayer, and burial in which the integrity and dignity of the decedent's remains are scrupulously maintained throughout.

36.     Muslim funeral practices are conducted in accordance with Muslim religious law which holds as it highest priority the safety and well-being of the living. An April 30, 2020 article published on the website Humanitarian Law & Policy, hosted by the International

Committee of the Red Cross, provides insight regarding the application of these guiding

principles within the context of the covid-19 pandemic. *See* Ahtned Al-Dawoody and Oran

Finegan,"COVID-19 and Islamic burial laws: safeguarding dignity of the dead," Humanitarian

Law & Policy, International Committee of the Red Cross  (April 30, 2020).

37.     The article states:

> *Islamic burial laws: protecting life, first and foremost*
>
> According to Islamic tradition, the burial of a deceased person is a collective obligation (farḍ kifāyah) by the Muslim community. This obligation consists of ghusl, ritual washing of dead bodies, kafan, or shrouding the body with pieces of cloth and finally salat al-janazah, a funeral prayer.
>
> In handling the remains of COVID-19 victims, whether in Muslim or non-Muslim majority states, Islamic rules developed by Muslim jurists and Islamic authorities must be guided by two considerations:
>
> ***First, the lives of body handlers and rest of the community must not be endangered. The protection of life (hifẓ al-nafs) is the first of the five ultimate objectives of Islamic law (maqāṣid al-sharī'ah) and therefore overrides any other Islamic obligations. It is therefore of paramount importance to keep in mind, as discussed below, that determining the Islamic position on any of these three Islamic burial laws for the victims of COVID-19 is dependent on the available medical evidence of how such a practice could put a life at risk.***
>
> Second, according to Islamic burial rituals, the dignity of the dead and the emotions of their loved ones are to be respected ***as much as is practically possible in extraordinary situations*** such as armed conflicts, epidemics, disasters or other catastrophes.

38.     Muslim leadership and clergy such as Imam Mahmood are acutely aware of the

same public health issues addressed by Delaware's laws and regulations. There is no reason to

believe that a Muslim clergyman and funeral rites practitioner such as Imam Mahmood is any

less qualified, less educated, or less trained and experienced than a Delaware licensed funeral

director to fully address any public health concerns associated with the rites and burials he is

called upon to perform.

39.     The economic cost of these religious rites is very modest.  The Imam's services are donated as part of his ministry. He is assisted in the cleansing and shrouding by a limited number of family members of the decedent and volunteers from the congregation. Transportation of the decedent's remains is by the Imam and congregation volunteers using a vehicle owed by the Mosque. The costs are de minimis, and are absorbed within the general overhead costs of the Mosque. Voluntary monetary contributions toward these costs by the family of the decedent and members of the Muslim community are encouraged and accepted, but contributions are never required as a condition of receiving the traditional cleansing, prayer and burial services given. The single greatest cost involved in every case has been the fee charged by a Delaware funeral director for filing the death certificate and obtaining the permit for transportation and burial required by Delaware law.

40.     Accordingly, when Imam Mahmood and the Mosque decided to proceed with offering Muslim services and burials on a charitable basis, they took several steps. With the assistance of Dr. Baqir, they created a Delaware nonprofit, non-stock corporation, DMFH --to segregate the Mosque's funeral-related activities and bookkeeping, to hold any necessary business licenses, and to assure federal income tax exemption. Dr. Baqir acted as the incorporator and was the corporation's registered agent.[1]

41.     Further, Imam Mahmood enrolled to earn college-level credits necessary to become a licensed funeral director himself, first at Delaware Technical Community College for general pre-requisite credits (with some of his SUNY/Farmingdale credits, including biology and

---

[1] DMFH's charter is currently void, according to the Delaware Division of Corporations, for failure to file annual reports. The Mosque and Plaintiff, as its lead Imam, continue to offer traditional Muslim religious rites and burials on a non-profit, charitable basis. Plaintiff currently intends to establish a new nonprofit corporation, named "Masjid Isa Janaza Services Corporation," to serve in DMFH's place.

chemistry, being honored toward completion) and then at Mercer County Community College in Trenton for credits specific to an Associate's Degree in Mortuary Science.

42.     In order to offer traditional Muslim funeral rites and burials immediately, Imam Mahmood sought out the assistance of a Delaware-licensed funeral director. The only service needed from the funeral director would be filing the death certificate and obtaining the Burial-Transit Permit.  Because the ritual washing, shrouding and prayer service would be performed at the Mosque, Plaintiff had no need to use the funeral director's facilities. And because Imam Mahmood would use a vehicle owned by the Mosque to transport the decedent's remains from the place of death to the Mosque, and then after the Mosque to the place of burial, Plaintiff had no need of transportation services from the funeral director. Imam Mahmood began contacting Delaware-licensed funeral directors to inquire what they would charge for this very limited, simple assistance.

43.     Virtually all of the funeral directors initially contacted by Imam Mahmood quoted fees of over $2,000 per funeral.  Many insisted that their facilities would have to be used. Some insisted that if their facilities would not be used, then use of their hearse would be required, or that if neither their facilities nor their hearse would be used, then one of their employees would need to "supervise" all activities from removal of the decedents' remains through completion of the burial. Imam Mahmood explained that, under the tenets of Islam, no use of facilities or hearses was required, and that the simple, traditional activities required no supervision from the funeral directors' staff. Certainly, no services were required that could justify fees of thousands of dollars per funeral.

44.     Imam Mahmood emphasized the non-profit nature of his ministry, and that many of the funerals would involve families of limited means who could not afford to pay thousands of dollars for a state-issued Burial-Transit Permit.

45.     After many fruitless inquiries and discussions with Delaware funeral establishments had failed to yield an arrangement offering acceptable economic terms, Imam Mahmood continued an arrangement previously made by the Mosque (with Dr. Baqir's assistance) with Faries Funeral Directors and Crematorium, Inc. ("Faries") of Smyrna, Delaware, and owner Robert Timlin.

46.     Timlin had been providing assistance to Muslim families referred to Faeries by the Mosque at a "discounted" rate of $850 per funeral. Timlin had raised issues similar to those raised by the other Delaware funeral establishments with whom Imam Mahmood had spoken, seeking to justify substantial fees based on use of Faries facilities, vehicles and employees. None of those services were needed.

47.     When Imam Mahmood joined as Imam of the Mosque in 2020, he proposed that he could act as an associate of Timlin's establishment while he was pursuing his pre-licensure studies at Del Tech and later at the mortuary sciences program at Mercer County Commnity College, and afterwards serve his required internship at Faries. In this way, Imam Mahmood could act on behalf of Faries, under Timlin's supervision, on economic terms that would limit Faries' costs in providing transportation, and allow Faries to provide the death certificate filing and Burial-Transit Permit services Plaintiff actually needed at a substantially discounted fee of $175 per funeral, similar to the fees charged to out-of-state commercial funeral homes which need to obtain a Burial-Transit permit for an out-of-state funeral for a person who died in Delaware.  This proposal became the basis of Plaintiff's work with Faries beginning in 2020.

48.     While this charge was still exorbitant, given that Faries' costs were limited by Imam Mahmood's performance of the required transportation, and all Faries was really doing was filing a death certificate and obtaining the necessary Burial-Transit Permit, it was the best arrangement Imam Mahmood could find. This arrangement continued while Imam Mahmood pursued his pre-licensure studies.

49.     From time to time, Timlin expressed dissatisfaction with the fees that Faries was receiving, especially after it became clear that there would be a more or less steady flow of funerals from Imam Mahmood's ministry. In January 2022, for example, Timlin proposed the following, excerpted from an email to Imam Mahmood:

> I have an alternative idea for you (and Naveed) to consider regarding the Muslim burials: I realize that Naveed "doesn't want to charge" for the Muslim Cemetery burials. But in my opinion, you are really not doing yourself any favors as a result. I know that many families are getting away with a free burial and you never hear from them again. I don't think it's right. Families should expect to pay something and the "donation" suggestion doesn't seem to be working ....Now, I feel forever indebted to Naveed for what he has done for me. He's been nothing short of wonderful and has been a true blessing to me. But continuing to operate with these burials with loose oversight at $175 is not the best business model. I'm not saying this in an effort to sound greedy or to complain. I'm obviously willing to help you and Naveed and your community (have done so for over 3 years now) but I do worry about the long-term impacts of the communities expectations for "free funerals" and also how it impacts the industry as a whole. And since my name is on it by association with you and with filings, authorizations, death certificates, burial permits, and oversight/management (though loose) I offer the following:
>
> The burial services offered to the Muslim Community are a partnership between the Mosque and Faries Funeral Home, we've stablished that. Faries Funeral Home offers a special discounted burial service through the Mosque for a reduced service fee of $1,500 (payable to Faries Funeral Home upfront). Faries Funeral Home will then donate 50% back to the Mosque. This way the Mosque DOES NOT charge. The Funeral Home DOES charge, but it's a discounted reasonable fee. We both win. If the family chooses another cemetery the fee is still the same and the family has to cover whatever extra expenses are incurred. Think about it. This makes perfect sense to me. We help the community. We both gain a little. I know that you have had many families use your burial services but are buried in another cemetery. So these families pay. My point is

that no matter what, every family should pay. Not all families should have to pay normal funeral home fees ($6,000 -$10,000) and as you said many black Muslim families from Wilmington cannot afford too much, and I understand that. But $1,500 is more than reasonable. And even the poorest of families can usually find a way to get the money together. If the family cannot pay the $1,500 fee they still have burial options for free from the State of Delaware's Indigent Burial Program.

50.     Imam Mahmood stood firm, however, he also speculated that some families in his congregation might elect to seek less traditional funerals in which Faries facilities, or its hearse, might be a desired element. Timlin and Imam Mahmood also discussed the possibility that after Mahmood completed his studies and internship and became licensed, they might go into business together, perhaps opening a satellite facility of Faries that would benefit from the flow of business from Imam Mahmood's ministry especially if less traditional, more elaborate funerals were desired by some Muslim families, while also earning more traditional profits by serving non-Muslim consumers. While they discussed this scenario a few times, those discussions never went beyond this stage, and subsequent developments made them impossible in any event.

51.     Those subsequent developments involved a crisis of conscience on the part of Imam Mahmood. When the time came in Imam Mahmood's coursework at Mercer County to begin the embalming practicum, which involved performing actual embalmings on human cadavers, Imam Mahmood found that he was unable to continue.

52.     All of his religious training in Islam, and his deep personal religious belief in its teachings, made it impossible for him to participate in what he felt to be a grave disrespect for, and humiliation of, the human being whose cadaver was being used.

53.     Islam considers the human body to be sacred, and demands the utmost respect for human beings in life and in death.  Because there was no way to complete his degree without

18

completing the embalming coursework, and because the Delaware pre-licensure internship requires the intern to perform twenty-five actual embalmings, Imam Mahmood discontinued his studies at Mercer County.

54.     The Faries arrangement deteriorated shortly thereafter, when Faries sought to raise its service charges to commercial levels. Imam Mahmood had begun searching for a different funeral establishment to handle Plaintiff's death certificate and Burial-Transit Permit requirements after Mr. Timlin at Faries began pressing for increased fees, purportedly based on his sudden discovery that Imam Mahmood's activities required supervision that could only be provided by a Faries employee that he would designate.  In connection with a handful of burials, Imam Mahmood arranged assistance in obtaining death certificates and Burial-Transit Permits through other Delaware funeral establishments.[2]

55.     Many quoted terms in the thousands of dollars for each case in which a death certificate was filed and a burial-transit permit obtained, sometimes offering transportation services or use of facilities that the Mosque does not need. Some establishments claimed that they were entitled to charge a "non-negotiable basic services charge" in the thousands of dollars. One Delaware establishment started at the reasonable price of $150 per funeral, to file the death certificate, and arrange the release of remains with a proper burial-transit permit. After a few funerals, this establishment offered additional, unneeded services, and when Imam Mahmood declined, raised their price per funeral into the thousands of dollars, effectively terminating the relationship.

---

[2] Some Delaware funeral establishments interviewed by Plaintiff's counsel requested to remain unnamed in connection with any litigation that might ensue. On information and belief, these requests were made because the person involved wished to avoid regulatory scrutiny, and/or retaliatory action by the Delaware Board.

56.     In late 2022, Imam Mahmood was able to negotiate assistance with death certification and permit requirements through Ernest "Trippi" Congo, a Delaware-licensed funeral director at his family's well-known establishment, Congo Funeral Homes, of Wilmington.  Recognizing the charitable nature of the Mosque's mission, as well as the simplicity and low economic cost of providing the services that were actually needed, Mr. Congo agreed to charge $150 per funeral.

57.     The difficulties with the Faries arrangement came to a head soon after the Congo relationship was established, when Mr. Timlin insisted that further assistance from Faries would require "supervision" by a designated Faries employee and would cost over $1,100 per funeral. The following reflects text messages between Imam Mahmood and Timlin from October 14-17, 2022:

[Timlin:]

> My normal discounted rate will apply. If you are expecting me to oversee this for $175, respectfully I cannot do that. Faries must oversee everything from pickup to burial or I cannot help. Please let me know asap. With my normal discounted fee it will be back to the $695 or whatever it was before (I'll look) plus extra discounted fees for our oversight from pickup to burial. Probably around a thousand dollars (have to look).

> If you can't do that then please find another funeral home who is willing to file for you at $150 without oversight or involvement. I think you said Congo would? I can no longer help without oversight/involvement. My time and my staffs cost costs.

> Again you're welcome to use someone else. If I help there must be involvement and oversight.

[Imam Mahmood:]

> ***

> Ok what is the final figure? Bcs I have to ask the family for approval. U follow. If they approve we r good if they don't then I'll tell em go find another funeral home. Cool?

And when it is convenient for you let me know I can come and sit and talk and bring back your body lift as well.
And once again I m sorry for misunderstanding Rob.

[Timlin:]

I don't want the body lift back. I truly don't need it.

My fees will be $1,076 (includes my filing/management fee, removal oversight, oversight/presence during washing, preparation, and prayer time and oversight/presence for burial, and all transportation/gas/travel fees)

Plus 1 death certificate is $25.

Grand total including death certificate is $1,101.
This will take up the majority of my staffs day (Bruce). But necessary for Faries involvement.

If Congo will allow you to take full control and charge you $150 just to file, then more power to them and to you. I'll understand.

[Imam Mahmood:]

Thank you Rob. Family is not prepared to pay for that and I told them they can find another funeral home.

We do business or not in future I still like to come and sit and talk.

Between you and I if we open up 2nd branch of Faries in Newark you can make more than $1100 per case and you can then provide all the supervision and support.

And that is what I have been asking from the beginning and it was my understanding that you need a year or so to free up yourself.

But it's ok. It's all good. Thanks. Let me know if you still want to sit down n talk. Bye

[Timlin:]

Mahmood, respectfully I do not feel the need to meet and talk. I'm ok but am disappointed with you and your decisions. I am firmly convinced that you decided to drop me from participating in the death certificate filings because of your ambitions to partner with a funeral home/funeral director

21

to help you with your funeral home business expansion aspirations. I'm not interested in that endeavor at all.

No meeting or explanation is going to change my mind.

Moving forward if Faries is to help with any death certificate filings for the Muslim community then we must provide oversight from pickup to burial and the fees will apply. With that said I doubt that you will use us again but we will standby for your community just in case.

[Imam Mahmood:]

I appreciate your honesty and respect that. However, your financial conditions are not reasonable because the families will never come up with that kind of money. If the money is issue we can open up a 2nd branch and make money. NP. There.

But for DMFH, you did mention the other option of where you said DMFH can obtain its funeral license and you act as the Funeral Director. I'm interested to hear about that.

[Timlin:]

Fees unreasonable? You have to be fucking kidding me.
Let me be clear with you ONCE AND FOR ALL:
-I am a legitimate funeral home that operates for profit.
-Everything was fine until you came along and messed with the system.
-Because of you, the State is watching you and how you "conduct business"
-If you're expecting me to allow you to do whatever you want under my license, you are wrong.
-If you want my help, it will be under my supervision and the discounted fees will apply.
-How in the world can you expect any business to operate using their license so you can conduct burials without fees? I did it too long frankly. No more.
-I would NEVER enter into a business partnership with you.
-I find you to be extremely rude and extremely pushy. You are a user. And most frankly, you ARE NOT legitimate. You ARE NOT a funeral director and YOU DO NOT KNOW WHAT YOU ARE DOING.
DO NOT TEXT, EMAIL OR CALL ME EVER AGAIN.
I'm done with you and done with your bullshit. Don't you dare come here or try to contact me ever again.

58.     One line from Mr. Timlin's text messages puts things in stark perspective: "Plus 1 death certificate is $25." This case is about routine, simple paperwork that should cost no more than $25 per funeral. Delaware-licensed funeral directors are leveraging their exclusive access to Delaware's automated online filing system to extract hundreds of times the reasonable cost of that paperwork from loved ones and families of deceased Delawarean Muslims.

59.     To justify such charges, the licensed funeral directors make up the imaginary need for supervision of simple, traditional religious funeral and burial practices that have existed for thousands of years. And the Delaware FDL, by requiring embalming training and experience for licensure, robs Muslims who are unwilling to sacrifice their sincerely held religious beliefs of the means to fend for themselves against such exploitation—becoming licensed themselves.

60.     Another important aspect of Mr. Timlin's final text message is the not-so-veiled threat to call in Delaware authorities: "the State is watching you and how you 'conduct business.'" That threat, together with the fact that Timlin was angered to the point of profanity that Imam Mahmood had the nerve to suggest charging $1,100 for paperwork services really worth $25 or less was unreasonable, helps to explain what followed.

### B.     Delaware Denies Imam Mahmood  Access To DelVERS

61.     While still working with Faries in May of 2022, Imam Mahmood contacted the Delaware Division of Public Health, Office of Vital Statistics to apply for access to the DelVERS online system. Imam Mahmood spoke on the telephone and corresponded with Office of Vital Statistics Management Analyst Nicholas Cruz. He filled out and submitted his application for access to DelVERS as instructed by Mr. Cruz, and additionally spoke with Mr. Cruz to answer his follow up questions during a 30 to 40 minute telephone call. Also, on June 7, 2022, Imam Mahmood provided Mr. Cruz with his most recent Pennsylvania Death Certificate

and Disposition Permit/Transit Permit, obtained from Pennsylvania, in hopes that it would facilitate the Office of Vital Statistics consideration of his application for access to DelVERS.

62.     On June 23, 2022, Mr. Cruz informed Imam Mahmood that his application for access to DelVERS was denied.  Mr. Cruz (incorrectly) explained: "The statute, 16 Del. C. 3123, states that only funeral directors may file death certificates. You are not licensed as a funeral director and are not acting as such. Accordingly, you are not able to electronically file a death certification as a result."

63.     Additionally, on July 25, 2022, Mr. Cruz's supervisor, Mardelle Dizon, emailed Imam Mahmood to offer this further explanation: "Per our legal counsel, you are not a licensed funeral director, a prerequisite for access to DeIVERS. Because you do not meet the basic prerequisite for access, it will not be granted to you by the Division of Public Health. If you have additional questions, please contact the Division of Professional Regulation Board of Funeral Directors."

64.     Notably, the Office of Vital Statistics employees did not mention that the Division of Public Health regulations provide a process to apply for an exemption on religious or traditional grounds from funerary regulations administered by the Division. *See* discussion below.

65.     Shortly thereafter, Imam Mahmood retained counsel for assistance in addressing the obstacles to his religious and charitable mission of providing traditional Muslim religious funeral services and burials in Delaware. To achieve his objectives, Imam Mahmood would need to obtain an exemption from the current FDL and related Public Health and Vital Statistics laws, to seek a change to such laws through the state legislature, or to successfully challenge their validity, as applied, under the federal and/or Delaware Constitutions.

66.     At this point, Imam Mahmood and the Mosque elected to explore the potential for a legislative solution. Dr. Baqir undertook to approach this avenue through contacts with Delaware legislators.

**C.      Plaintiff Pursues a Legislative Solution, But the Board Lobbied Successfully to Postpone Any Legislative Action**

67.     In 2023, acting on behalf of the Mosque, Dr. Baqir contacted Delaware Senate Majority Leader, Senator Bryan Townsend, to discuss the difficulties being encountered by Imam Mahmood and the Mosque in carrying forward the mission of providing traditional Muslim services and burials to deceased Delaware Muslims and their families on a charitable basis.

68.     Dr. Baqir explained that Delaware's application of its Public Health/Vital statistics laws have made it impossible for Imam Mahmood to gain access to the DelVERS online system, the sole point of access to file death certificates and obtain transit/burial permits. Through its Division of Public Health/Office of Vital Statistics and its Division of Professional Regulation/Board of Funeral Services, Delaware has applied its laws and regulations to restrict access to the DelVERS system to licensed commercial funeral directors.

69.     Applying Delaware's Public Health/Vital Statistics and Professional Regulation laws in this way excludes Muslims who are unwilling to sacrifice their religious beliefs.

70.     To become a Delaware-licensed funeral director, a person must (1) complete academic coursework in embalming, which includes practicum requirements of participation in embalmings of human remains, and (2) complete an internship with a Delaware-licensed funeral director in which the intern is required to perform or participate in performing at least 25 embalmings. *See* discussion, *infra*, at ¶¶ 144-163.

71.     Further, every Delaware funeral establishment must maintain a fully equipped, functioning embalming room with a working embalming machine, at a cost of several thousands of dollars.

72.     In its continued insistence on the necessity of embalming education, training and internship experience as a condition to licensure, Delaware's law is a vestige of times long past, when embalming was the centerpiece of American funerary practices. The requirement persists today despite the facts that Delaware law no longer requires embalming at all, and consumer preference has shifted away from embalming and burial as the prevalent form of disposition. Cremation is now the most frequent means of disposition selected by consumers.

73.     These circumstances raise an important question—why is access to DelVERS strictly limited to persons who have complied with time consuming and expensive requirements for education and training in embalming, when embalming is completely unnecessary to compliance with any of the statutory or regulatory requirements of Delaware's public health laws for disposition of human remains?

74.     The answer lies in the history of the funeral director profession in the United States, but in short and bluntly put, Delaware has set up a system of self-regulation for the profession, and that system, consisting of an unsupervised board dominated by a majority of licensed commercial funeral directors, has granted Delaware funeral directors a market protected from competition. *See* discussion, *infra* at ¶¶103-125. While some states have made progress in removing barriers to beneficial competition as well as to minority religious practices, Delaware's laws and regulations are now among the most regressive and restrictive funeral laws in the nation.

26

75. These laws are ripe for change, even on purely secular grounds. They serve no purpose but to further entrench the barriers to competition that benefit Delaware's existing licensees to the detriment of Delaware consumers. Their application to Plaintiff and the Mosque is doubly wrong, forcing them to rely on Delaware licensed funeral directors who serve no public health purpose, free to charge whatever their protected market will bear, all merely to file the legally mandated paperwork for traditional Muslim burials. The effect of these laws, and their discriminatory enforcement by Defendants herein, is to erect a barrier at the hospital morgue and other places of death, denying Plaintiff, acting as Muslim clergy seeking to practice his Muslim religious funerary traditions, access to the bodies of the Muslim dead, unless someone pays a licensed Delaware funeral director an exorbitant fee simply for procuring paperwork, while at the same time denying Muslims the license necessary to procure the paperwork for themselves, unless they sacrifice their sincerely held religious beliefs against the practice of embalming.

76. In a series of meetings and conversations with Senator Townsend during 2023, Dr. Baqir discussed these issues and potential pathways to a solution that would avoid seeking court intervention. Dr. Baqir's discussions with Senator Townsend explored the potential for either negotiating an ad hoc exemption with the Division of Public Health and/or the Division of Professional Regulation (and the Board), or introducing legislation establishing either a broad religious exemption, or creating a two-track licensing system, with one track excluding any requirements relating to embalming (similar to the approach taken by the state of Maryland in 2007).

77. Senator Townsend undertook to gauge the receptiveness of groups that would have interests affected by such legislation. Senator Townsend met with representatives of the Board of Funeral Services as part of this process.  Going into this meeting, Senator Townsend

did not anticipate that the Board would so vigorously oppose legislation that would provide an appropriate exemption based on religious considerations such as the Muslim and Orthodox Jewish strictures against embalming. After the meeting, Senator Townsend drafted and circulated a proposed bill that would take the lightest possible touch in allowing an exemption to permit the "person in charge of interment" in connection with a religious funeral ceremony to file death certificates and to receive, retain and present a burial-transit permit.

78.     At its March 21, 2023 meeting, the Board discussed the proposal for a legislative exemption for "religious leaders," as the Board minutes put it. The passage from the Board minutes reads as follows:

> **Discussion of Religious Exemption to The Practice of Funeral Services**
> Ms. Singh provided background information regarding potential legislation to exempt religious leaders from having a funeral director license in limited situations. Members discussed working with the Muslim community for years and they expressed concerns this might pose a risk to the public for health reasons such as blood borne pathogens and the need for OSHA inspections. Legislation from OH was shared with board members. Mr. Parsell commented that an exemption would eliminate all power of the board, and this leaves consumers unprotected. They also commented that many divisions in DE would be affected if an exemption is granted.

Apparently, no one present spoke in favor of the proposed legislation.

79.     The meeting effectively consisted of an echo chamber where Board members listed reasons to oppose an exemption. Board President Andrew Parsell raised the central concern that "an exemption would eliminate all power of the board, and this leaves consumers unprotected." Unidentified members piped in with the other traditional justifications for funeral director self-regulation—public health and worker safety.[3]

---

[3] Apparently the Board is unaware that church employees performing religious services are already considered by the Department of Labor to be exempt from OSHA regulation. *See* 29 C.F.R. Part 1974(4)(c)(1) ("Any person, while performing religious services or participating in them in any degree is not regarded as an employer or employee under the Act, notwithstanding

80.     Not surprisingly, before the draft bill was submitted to the Senate for consideration, its opponents asserted that a thorough study was warranted, including, in addition to a simple exemption as suggested by the draft bill, studying whether a two-tier licensing structure similar to Maryland's would be the best approach. This maneuver effectively postponed any legislative action to 2025 or later, if at all. By year end 2023 it was clear that no legislative solution to the Mosque's dilemma was on the near term horizon.

**D.     The Delaware Board of Funeral Services Initiates a Regulatory Complaint and Investigation Against the Mosque**

81.     Within days after the Board's March 21, 2023 discussion of the proposed legislation to provide a religious exemption, the involvement of Muslim clergy in that legislative effort, and the threat posed thereby to the Board's power to protect the commercial interests of licensed funeral directors, the Board took action designed to shut down activity by Plaintiff. On March 30, 2023, the Division of Professional Regulation wrote to DMFH to inform it that a complaint alleging DMFH is "[p]racticing without a funeral establishment permit and a licensed funeral director" had been received by the Division. The letter was signed by Megan Miller, Investigative Supervisor, and requested a response in writing within twenty (20) days. The letter in its entirety stated:

> The Division of Professional Regulation is in receipt of a complaint alleging unlicensed activity by you in Delaware. A copy of the complaint is enclosed. Please respond to the complaint, in writing, to the Division office within twenty (20) days.
>
> The Division's investigative unit is responsible for the conduct of investigations resulting from complaints of unlicensed practice in a profession requiring professional licensure. A contact person from the Board of Funeral Services will be appointed; however, the investigation will be conducted by the Division of Professional Regulation. In cases in

the fact that such person may be regarded as an employer or employee for other purposes—for example, giving or receiving remuneration in connection with the performance of religious services.").

which the Division's investigation does not produce evidence of unlicensed practice, the complaint will be closed by the Division.

If the investigation does substantiate the complaint of unlicensed practice, the matter will be forwarded to the Attorney General's Office. Please note that the Board of Funeral Services has the authority to hold administrative hearings and impose professional discipline of licensees and non licensees in that profession.

I hope this information clarifies the complaint process. If you have any questions, you may contact 302-744-4500 and request to speak to an investigator or send your email request to investigations.dpr.delaware.gov.

82. The letter did not attach the complaint, but instead attached a redacted copy of the complaint, in which the first and last names of the complainant were hidden. The letter failed to identify any witness or other evidence substantiating the allegations of unlicensed practice. Further, and consistent with DMFH's status as a non-commercial charitable organization, the Complaint admitted that there was no "business involved, if any." On information and belief, the complaint was filed with the knowledge and active coordination and assistance of Nicholas Picollelli, current Secretary (and former President) of the Board. At the Board's July 25, 2023 meeting, Mr. Picollelli checked on the status of the complaint, asking Ms. Miller about the complaint process "and how would he know the outcome of the complaint filed."

83. The March 30, 2023 letter attaching the complaint inaccurately inflated the legal authority of the Board by stating that "the Board of Funeral Services has the authority to . . . impose professional discipline of . . . non licensees in that profession," when, in fact, the Board's authority with respect to non-licensees is limited to authority over "individuals," not entities, and is further limited to issuing a warning, and only after doing so, to applying to the Attorney General's office for issuance of a cease and desist order. No allegation, much less any determination, was ever made that any "individual" was engaging in unlicensed practice.

84.     Moreover, no warning was ever received from the Board, and, to Plaintiff's knowledge, no cease and desist order was ever sought or issued.

85.     DMFH responded to the Division of Professional Regulations' letter attaching the complaint by letter of counsel dated April 18, 2023. The letter denied the charges, explaining that DMFH is not, and was never intended to be a funeral establishment, which would require it to have an embalming room, which is against Islamic principles; that DMFH is a non-profit entity through which the Mosque provides traditional Muslim funerary rituals and burials on a charitable basis as follows; that because of Delaware law's embalming training and education requirements for licensure, Imam Mahmood cannot become a licensed funeral director and never intended that his actions as clergy providing traditional Muslim funerary rituals and burials be considered the practice of funeral services under Delaware law; that Imam Mahmoud had been denied access to DelVERS, which has created a substantial burden on his practice of the Muslim religion; and that counsel requested an opportunity to discuss resolution of these matters in a way that would satisfy Delaware and federal law, including their constitutional protections for the free exercise of religion .

86.     No response to the Answer letter has been received. When Dr. Baqir informed Senator Townsend of receipt of the March 30, 2023 letter and the attached complaint, Senator Townsend sought and received assurance from the Division of Professional Regulation that no enforcement action would be taken while legislative action addressing the situation was under discussion or consideration.

87.     The Board's response, apparently, has been to leave the complaint—which alleges a violation but offers no facts to support the allegation—hanging.  It stands as a threat, not only to Plaintiff, but also to any Delaware funeral director who would consider assisting him.

88.     Thus, the Board's actions to postpone any legislative action, and its actions with respect to the complaint of unlicensed practice, have placed Plaintiff in a form of legal/regulatory limbo, placing a cloud over continued pursuit of his religious and charitable mission, while at the same time discouraging Delaware-licensed funeral directors from working with him to enable access to the only source for the death certificates and permits necessary to continued pursuit of that mission.

89.     The complaint's existence also gives Delaware-licensed funeral directors ammunition to justify higher fees for taking on regulatory risk in dealing with Plaintiff.

**E.      <u>Congo's Assistance is Deeply Appreciated But Insufficient to Obviate Vindication of Plaintiffs' Constitutional Rights to Free Exercise of Religion and Equal Protection of the Laws</u>**

90.     As previously noted, in late 2022 Plaintiff began working with Ernest "Trippi" Congo of Congo Funeral Home of Wilmington.  Recognizing the charitable nature of Plaintiff's mission and the limited nature of the services that Plaintiff actually needed, Mr. Congo charged $150 per funeral. This per-funeral charge for required paperwork is 6 times the actual cost suggested by the October 2022 quote by Mr. Timlin of Faries of "1 death certificate is $25," *see* ¶ 57, *supra*, it was the best offer Plaintiff was able to find, and it was workable within the overall context of his mission. However, the Congo establishment eventually discontinued its support of Plaintiff's charitable mission after citing concerns that they would face regulatory repercussions from the Board if they continued providing "permit only" service.

91.     The arrangement had enabled Plaintiff to carry forward his charitable mission in full compliance with Delaware laws and regulations, but experience has shown that such arrangements are not an adequate substitute for vindication of Plaintiff's religious rights under the federal and Delaware Constitutions.  Just before Mr. Congo finally withdrew his support, an event occurred in connection with a recent traditional Muslim funeral handled by Imam

Mahmood on April 16, 2024 that illustrates the level of active interference Plaintiff is facing from the Board.

92.     On that date, Imam Mahmood alerted Mr. Congo that he needed to remove remains of a Muslim decedent from Wilmington Hospital that day for a funeral service and burial. When Imam Mahmood arrived at the hospital medical records department to request release of the remains, the hospital medical records official, no doubt recognizing that Imam Mahmood was the Muslim she had been warned about by calls from or at the behest of the Board, quizzed him concerning where he intended to take the remains. Imam Mahmood informed the official that the remains would be transported to the Mosque for the ritual washing, shrouding and prayer, and then to the Muslim Cemetery of Delaware for the burial. Imam Mahmood also informed the official that Congo was filing the death certificate and had arranged for issuance of the Burial-Transit Permit.

93.     The Wilmington Hospital medical records official, instead of treating Imam Mahmood's request as she would have treated a non-Muslim's request—as a routine matter of reviewing the paperwork and releasing the decedent's remains—instead announced that she would need to call the Congo establishment to obtain additional information. When she placed the call, Mr. Congo was unavailable, and Mrs. Congo (his mother, Cheris Congo) got on the line. She told the Wilmington Hospital medical records official that the body should not be released to Imam Mahmood unless he intended to bring the remains to Congo's establishment in Wilmington.

94.     Meanwhile, Imam Mahmood had gotten Mr. Congo on the line on his cell phone, and told the official that Mr. Congo was on the phone saying that the remains should be released as planned.  The official told both Congos that they should talk amongst themselves and call

back when a final decision had been made. Imam Mahmood waited in the medical records office for thirty minutes until Mr. Congo called back to authorize the release and that Imam Mahmood was authorized to transport the remains to the Mosque and then to the cemetery.

95.     While the matter was properly resolved and the funeral and burial was thereafter expeditiously completed, the April 16 episode is one concrete circumstance demonstrating that vindication of Plaintiff's religious civil rights under the federal and Delaware constitutions is likely to be the only measure adequate to remedy the Defendants' discriminatory and improper enforcement of Delaware's public health, vital statistics and funeral services laws against him.

96.     The April 16 episode also poignantly illustrates the dynamics at play in this case:

- Mrs. Congo's part in the matter reflects the mindset of Delaware-licensed commercial funeral directors who believe themselves entitled to profit substantially from their State-sanctioned monopoly over access to the sole means of filing death certificates and obtaining Burial Transit Permits, and who will accordingly insist that remains must pass through their facilities even if no services available there are needed, or must be "supervised" so that commercial funeral directors may "earn" their mandated profits,

- The Wilmington Hospital medical records official's actions show that calls made at the behest of the Board under the color of Delaware law and regulation, instructing that when they encounter a Muslim fitting Imam Mahmood's description, they should interrogate him to determine if transportation to a commercial funeral establishment is his intention, and if not, the remains at issue should not be released to him. The content of the interrogation and the resulting instruction, and its acceptance by the hospital officials as authoritative, demonstrates its origin in the Board.

- Mr. Congo's role in the matter is in accordance with the nobler aspirations of his profession, to render assistance to grieving families of limited means at discounted prices properly reflective of the value of the specific assistance needed, as recognized, for example, by the Federal Trade Commission: "Some funeral providers enter into agreements with religious groups, burial societies, or memorial societies to arrange funerals for their members at special prices." Federal Trade Commission, "Complying with the Funeral Rule."

- Imam Mahmood's efforts on behalf of the Mosque, its congregants, and the Muslim community is the traditional role of clergy. All he is doing is practicing his religion to the best of his ability, providing leadership and service in facing death and the grief that accompanies it—activity common for clergy in all

religions. As alleged below, this traditional role poses an existential threat to the commercial interests of licensed funeral directors, which has led to repeated conflicts over the history of the American funeral services industry. This existential threat is a real one—what would happen if clergy could provide everything needed by their congregants facing the painful and inevitable death of loved ones? Licensed funeral directors and the self-regulating boards that serve them therefore jealously guard every bit of exclusive power granted to them under state laws.

**F.      The Board Further Violates Delaware Law in its Determination to Prevent Plaintiff's Religious and Charitable Activities Unless A Commercial Funeral Director Gets a Handsome Fee**

97.      In his efforts to ensure that his religious services and burials are conducted in compliance with Delaware's death certification and Burial-Transit Permit requirements, in early 2024, Imam Mahmood enlisted the help of a friend, Christopher Coleman of Distinguished Memorial Chapels in Philadelphia, Pennsylvania. Mr. Coleman is a Pennsylvania-licensed funeral director, and, as of February 14, 2024, also holds Delaware Funeral Director "Limited" License No. K4-0010120.

98.      Section 3108 of the Delaware Funeral Director Law requires the Board to issue a "limited license" to funeral directors validly licensed by another one of the United States, provided that a similar privilege is granted by that jurisdiction to Delaware licensed funeral directors. The limited license governed by Section 3108 "will allow the licensee to make a removal of a dead human body in this State, return the body to another state or country, return dead bodies from another state or country to this State for final disposition, complete the family history portion of the death certificate, sign the death certificate in the licensee's capacity as a licensed funeral director, and execute any other procedures necessary to arrange for the final disposition of a dead human body." The statute uses the verb "shall," indicating that the Board has no discretion to deny the limited license contemplated by Section 3108 if the applicant meets the statutory conditions of eligibility.

99.     In order to perform the stated functions under the "limited" license, the limited licensee and one or more administrative employees under his supervision must be granted access to the DelVERS system.

100.     Mr. Coleman agreed that his establishment would provide services to Plaintiff in support of his charitable mission. Recognizing that the simple, prompt Muslim services and burials performed by Plaintiff as part of his mission do not require use of his facilities and that Imam Mahmood was well-qualified to perform them, he agreed that his establishment would provide "permit only" service, if Imam Mahmood would agree to be hired as administrator for that purpose.

101.     Accordingly, acting as administrator, Imam Mahmood submitted applications for access to DelVERS for Mr. Coleman and himself. Such applications are normally granted within 24 to 48 hours as a matter of routine. The applications were made in February 2024. The email correspondence over the following months reflects that instead of granting the DelVERS applications as a matter of routine in accordance with the Statute and standard practice thereunder, administrator Marzelle Dizon, who was involved in the denial of Imam Mahmood's June 2022 DelVERS application, recognized his name on the new applications from Distinguished Memorial Chapels and referred them to the Delaware Attorney General's Office. The reason for such referral is unknown, as there are no apparent defects in the application. Plaintiff believes that the DelVERS administrators refused the application based on instructions of the Board, to prevent him from exercising his Muslim religion and pursuing his charitable mission, unless a Delaware commercial funeral director collects a substantial unearned fee. Plaintiff's belief was confirmed on June 12, 2024, when DelVERS administrator Tanya Lyons stated in an email that the application for Mr. Coleman and his staff had been granted, but that

Imam Mahmood's application has been denied because his "email address and phone number are associated with . . . Islamic Burials." Strangely, the email also asserted that Imam Mahmood "is not an administrator for [Distinguished Memorial Chapels]," although the application plainly stated that Imam Mahmood is, in fact, an administrator for Mr. Coleman's establishment.

102.    Like the April 16 2024 incident with Congo described above, the actions of the DelVERS administrators in denying the DelVERS applications submitted by Distinguished Memorial Chapels demonstrates that the only effective remedy for Plaintiff will be vindication of his constitutional rights to the free exercise of religion and equal protection of the laws through this action.

### G.    Delaware's Laws and Regulations Governing the Disposition of Human Remains and the Profession of Commercial Funeral Directing

***National Historical Background***

103.    The Delaware statutes relevant to this case are those (a) administered by the Delaware Division of Public Health under Title 16, Chapter 31, pertaining to Vital Statistics (Subchapters I and II) and Burial, Removal or Cremation of Dead Bodies (Subchapter III), and (b) administered by the Delaware Division of Professional Regulation and its Board of Funeral Services under title 24, Chapter 31 (the Delaware FDL).

104.    These statutes and the regulations promulgated thereunder are best understood within their historical context. Plaintiff believes that the history recounted herein puts in perspective the actions of the Delaware Board and its officers. Plaintiff recognizes that the profession of funeral directors serves an important need and there are many examples of good-willed professionals and establishments in Delaware serving the public with compassion and professionalism. The history of the profession and the American experience of regulating it speaks for itself, however, as a textbook example of regulatory capture.  The result has been less

37

than optimal from the standpoint of regulation serving the public good, and there are many examples of State Boards treating the licensees as their main constituency, as opposed to the bereaved purchasers of their goods and services.

105.     American funeral practices developed over time from their origins in ancient Roman and English traditions. *See* Lynner, Natalie B., "Death in a Pandemic: Funeral Practices and Industry Disruption, 70 UCLA L. Rev. 154, 157 (June 2023) ("Lynner"); Marsh, Tanya D., "You Can't Always Get What You Want: Inconsistent State Statutes Frustrate Decedent Control Over Funeral Planning," 55 REAL PROPERTY, TRUST AND ESTATE LAW JOURNAL 148, 152 (Summer 2020). The central role of religion and clergy naturally has never been questioned in a nation committed to principles of religious freedom. Lynner, 70 UCLA L. Rev. at 161. In the eighteenth century most American died at home, and "a good death occurred at home with family assembled around the deathbed to hear a dying person's last words, which were highly valued." *Id.*

106.     The Civil War had a profound effect on American funerary practices, and can be credited with the birth of the funeral director profession. For the first time, many young men were dying far from home. Families started traveling to battlefields shortly after the conclusion of the battle to reclaim the bodies of loved ones and to be sure that their loved ones died and were not misidentified. *Id.*, at 163.  Undertakers pursued opportunities to retrieve the remains of fallen soldiers to bring them home for a funeral service patterned after pre-war practices. Embalming came into increasing use to provide additional time before burial for such services. By the early 20th Century, undertakers trained in embalming had begun opening businesses called "funeral homes." By World War II most Americans who died in urban areas were embalmed. *Id.* at 163-166 and nn. 50-85.

107.    Thus, the profession of the "funeral director," practicing in establishments frequently called "funeral homes," was born in the United States, and embalming was its integral centerpiece. State regulation followed, with funeral directors pressing for licensure requirements to advance their professional stature and exclude would-be competitors, while states justified such requirements by reference to well-supported worker safety issues stemming from the use of toxic chemicals in the embalming process and "the belief that embalmed bodies were more sanitary than unembalmed bodies." *Id.* at 166. By 1900, 25 states had enacted such laws. *Id.* A prevalent feature of such laws were the so-called "ready to embalm" requirements. These provisions required every funeral home establishment to be supervised by a funeral director licensee educated and trained in embalming and every establishment, including every branch location, to be fully equipped and "ready" to embalm. "Principally enacted in the early half of the twentieth century, these "Ready-to-Embalm" laws are in force in a majority of states today." *See* Foos, David., "State Ready-To-Embalm Laws and the Modern Funeral Market: The Need for Change and Suggested Alternatives," 2012 Mich. St. L. Rev. 1375 (2001). *See also* Harrington, David E., "Preserving Funeral Markets with Ready-to-Embalm Laws." 21 Journal of Economic Perspectives 201 (Volume 21, Number 4—Fall 2007) ("Harrington") (presenting historical account and market analysis demonstrating that such laws, for which funeral director trade associations continue to aggressively lobby, harm competition by increasing prices to funeral consumers, excluding potential non-traditional competitors, and limiting the choices available to funeral consumers).

108.    Not surprisingly, these state laws protecting the funeral director profession led to problems for American funeral consumers. "[B]y 1960, a strong social dialogue had . . . developed condemning the industry for exorbitant funeral prices and exploitation of grieving

consumers." Foos,  2012 Mich. St. L. Rev. at 1376.  Ultimately these concerns led to the Federal

Trade Commission's adoption of its "Funeral Rule" in 1982, but problems in the industry's

treatment of consumers were apparent long before mid-century.  As David Foos recounts:

> As early as 1905, social workers complained that funeral directors were deliberately pricing funeral services so as to absorb as much of the deceased's insurance policy as possible.  In 1921, Quincy Lamartine Dowd questioned the exploitative operating practices of many funeral directors and argued against the extravagant cost of funerals. Similarly, in 1928, John Gebhart examined the funeral industry's sales tactics and pricing methods to conclude that "[o]nce the undertaker secures possession of the body, he can usually charge all that the traffic will bear."
>
> * * * *
>
> Testifying before a congressional committee in 1947, the famous undertaker W.W. Chambers characterized the industry as "the most highly specialized racket in the world." "Chambers testified that funeral homes refused to produce itemized bills because there were "no standard prices; whatever can be charged and gotten away with is the guiding rule." This testimony received considerable national attention as newspaper headlines framed Chambers's off-color quips to generate reader interest.
>
> * * * *
>
> In 1961, after writing an article condemning funeral industry practices, political activist Jessica Mitford appeared on a local San Francisco television show to debate two funeral directors. Her electric appearance caught the attention of the national magazine Saturday Evening Post. Mitford was subsequently featured in an article entitled, Can You Afford to Die?, which drew more reader response than had ever been received by any other single article published in the Saturday Evening Post.
>
> Social awareness of funeral industry practices peaked in 1963, as Mitford once again targeted the funeral industry in her seminal critique entitled, The American Way of Death. The book, which spent several weeks atop the New York Times Bestseller List and remained a constant on the list for a year, lamented the over-commercialization of funerals and advocated for simpler, cheaper services. According to Mitford, funerals were a "huge, macabre and expensive practical joke on the American public." Moreover, the funeral transaction was structured as an elaborate trap for unwary and easily deceived funeral consumers, who were regularly exploited for pecuniary gain.

Foos, 2012 Mich. St. L. Rev. at 1377-1379 and nn. 12-15, 17-29.

109.     FTC regulation via the Funeral Rule followed a ten year study in which the FTC documented "a striking absence of price competition in the funeral industry." Foos, 2012 Mich. St. L. Rev. at 1379 and n. 33.  The lack of price competition "inhibited potential market entrants from challenging established funeral homes, insulating the market from competition, and allowing for higher prices." *Id*. at 1379 and n. 35.

110.     In addition, information asymmetry between the licensed funeral industry and grief stricken consumers induced demand for services that otherwise would not have been purchased, and chief among these services was embalming. Accordingly, the FTC's Funeral Rule forbids misrepresentations in several categories, specifically including misrepresentations that embalming is required under state or local law. *See* 16 C.F.R. § 453.3(a) (2012). "This section was necessary to prevent unwary consumers from being deceived into purchasing embalming services when they would otherwise not have." *Foos*, 2012 Mich. St. L. Rev. at 1381, citing Funeral Industry Practices, 47 Fed. Reg. 42,260, 42,276 n.162 (Sept. 24, 1982) (codified at 16 C.F.R. pt. 453) (describing a survey finding that when consumers were unaware that embalming was not legally required, embalming took place 88.1% of all cases but, when consumers were aware that it was not required, embalming only took place 58.5% of the time).

111.     The FTC's Funeral Rule sought to level the informational playing field by requiring truthful disclosure regarding prices and services, including through the requirement that funeral practitioners provide a "general price list" covering the services available. The intention was that consumers would be better able to shop for and negotiate prices, inducing robust price competition, which in turn would stimulate market entry by more providers. However, the industry effectively lobbied for the inclusion of a "non-declinable basic services fee" including overhead cost recovery in the general price list, and industry guidance through

41

FTC staff interpretations have opined that this same non-declinable fee must be charged when the funeral provider offers a "discount package," while in cases where the consumer selects only one or more of the limited services of "forwarding remains, receiving remains, direct cremation and immediate burial," the provider is free to discount from the full non-declinable basic services fee. See FTC Staff Opinion 09-6 (November 24, 2009).

112.    What this means, with respect to embalming, is that the FTC regulations permit funeral providers to recover overhead costs of maintaining their state-mandated "readiness" to embalm in prices charged to consumers who do not purchase embalming services, although they are free to compete by not including such embalming overhead cost recovery if they elect to provide any of the limited services of "forwarding remains, receiving remains, direct cremation and immediate burial,"

113.    While the FTC's Funeral Rule has produced some benefits to funeral consumers, its potential benefits have been frustrated by the presence of a well-heeled funeral industry lobby, and by resulting regulatory capture. The state self-regulatory boards have wielded the "ready to embalm" statutes as barriers to entry, excluding competition and protecting the profitable businesses of their incumbent licensees. The industry has resisted efforts to enable would-be competitors who, for secular or religious reasons, do not practice embalming. The case of Arizona, as recounted by David Foos, illustrates the problem:

> The embalming room requirement was subject to extensive review in Arizona in 2003. The Arizona Auditor General reviewed Arizona's licensing requirements and concluded that "[t]he requirement for a new establishment to contain a preparation room creates a barrier [to competition] and unnecessarily creates increased costs to the consumer." The Auditor General proposed an amendment that required any establishment offering embalming to either have an in-house embalming room or, as an alternative, demonstrate access to an off-site embalming room. "Establishments that [did] not offer embalming would not be subject to [any] requirement [for embalming facilities]." In support of this

> recommendation, the Auditor General cited the potential cost of these rooms, which varied from $ 10,000 to $ 35,000, and noted the embalming room requirement was "outdated" for modern practices.
>
> The Arizona State Board of Funeral Directors and Embalmers rejected the Auditor General's recommendations. In so doing, the Board noted that "[i]t would not be in public health interests" to allow a funeral establishment to exist without an embalming room. Further, because the statute did not require the embalming facilities to actually be used, there was no barrier to centralizing embalming operations. Finally, embalming facilities were necessary to provide consumers with a choice of care, and because, if "a problem occurs with the body, it is reasonable to expect that a consumer could have that problem resolved in a timely manner." Consequently, the Arizona law was left unchanged, and the state currently maintains its strict Ready-to-Embalm scheme.

Foos, 2012 Mich. St. L. Rev. at 1391-1392 and nn. 137-147. The regulatory capture in Arizona is typical across the United States, with unsupervised industry participant regulatory boards using their state-sanctioned authority to regulate and enforce licensing and facility requirements to protect incumbent licensees and their profitable businesses from competition not only from potential commercial market entrants, but also from religious and charitable organizations focusing on  the needs of their grieving congregants and secular beneficiaries.

114.    Delaware currently has one of the most restrictive "ready to embalm" regimes (see discussion below), and its industry-dominated Funeral Board has consistently insisted on maintaining its full force and effect for the benefit of its commercial licensee constituents. As of 2018, Kenyon College economics professors David E. Harrington and Jaret Treber estimated that Delaware's combined embalming education and training licensure and facility embalming room requirements were costing Delaware consumers $4,702,633 annually. *See* Numbers Matter: Estimating the Cost of State Funeral Regulations, 8 Wake Forest J. L. & Pol'y 29, 58 Table 3(a) (Jan. 2018).

115.    Several early state court decisions recognized the illegitimacy of "ready to embalm" statutory schemes enacted in their states. In 1922, the Supreme Court of Wisconsin,

affirming the trial court's decision that a statute requiring all undertakers to secure an

embalmer's license was unconstitutional and void, zeroed in on the absence of any public health

justification for such a rule:

> Can the legislature require an embalmer's license from an undertaker as a
> condition for pursuing the latter calling? . . . ' It is apparent from these
> definitions of an undertaker and the statutory definition of embalming that
> the two are vitally different. An embalmer, as such, does not bury the
> dead; he does not take charge of funerals; he does not dress the body,
> procure the coffin or do the many other things that an undertaker does. His
> sole function as an embalmer is to so treat the body by means of chemical
> substance, embalmers' fluids, gases administered either externally or
> internally, or both, as to disinfect and preserve the body. ***Embalming is
> not required by any law of the state. It is not essential to public health,
> safety, convenience, or comfort under present conditions of burials and
> cremations.*** ...... Some have religious scruples against embalming because
> it mutilates the body of man-made in the image of God, just as others have
> religious scruples against cremation.
>
> Since embalming is not compulsory, since it is not universally practiced,
> why require every undertaker to have an embalmer's license before he can
> bury the dead? ***The qualifications required for obtaining an embalmer's
> license would add nothing to his fitness for burying an unembalmed
> body. It would add nothing to public health, safety, convenience,
> comfort, or morals.*** A police regulation restricting to the extent of
> prohibition an ancient, honorable, and necessary calling must justify its
> validity on the ground that it is essential to the public health, safety,
> convenience, comfort, or morals. This statute has no such sanction. It was
> beyond the power of the legislature to make it a valid enactment.

*State ex rel. Kempinger v. Whyte*, 177 Wis. 541 (1922). *See also Wyeth v. Thomas*, 200 Mass.

474 (1909) ("Except in those cases where embalming is desired for a special reason, we know of

nothing connected with the duties of an undertaker that calls for the work of a licensed

embalmer..........In cases generally it is not an essential part of the duties of an undertaker, and it

***has no relation to the public health***." (emphasis added)).  A decade earlier, the Court of Appeals

of New York affirmed the invalidation of a similar statute, commenting: "We cannot refrain

from the thought that the act in question was conceived and promulgated in the interests of those

then engaged in the undertaking business and that the relation which the business bears to the

44

general health, morals and welfare of the state had much less influence upon its originators than the prospective monopoly that could be exercised with the aid of its provisions." *People v. Ringe*, 197 N.Y. 143. (1910).

116.    Flash forward to the present time—the widespread current existence of "ready to embalm" laws is a testament to how a powerful and persistent funeral director lobby can effectively override the wisdom of the courts. *Foos*, 2012 Mich. St. L. Rev. at 1390 n. 133 (stating in 2012 that 31 states still have embalming room requirements for funeral homes), and cases across the country demonstrate that the funeral director profession has lost none of its interest in using such laws protect their markets from competition.

117.    As recently as late December 2023, the United States District Court for the Northern District of Indiana granted a preliminary injunction against enforcement action taken against a "death doula" who sought to provide death-related counseling and support to Indiana death care consumers. *See Richwine v. Matuszak*, 2023 U.S. Dist. LEXIS 225581 (N.D. Ind. December 19, 2023).

118.    Similar to the present case, the *Richwine* case was initiated when an unidentified party purportedly filed a complaint of unlicensed practice of funeral directing. A year passed before the Indiana Attorney General's office filed a motion with the Indiana funeral and cemetery board. The investigation ended when the death doula consented to an administrative order barring her from providing certain end of life counseling services. The doula then challenged the order in federal court as a violation of her First Amendment rights.

119.    The Indiana Board failed to justify its enforcement order, identifying no substantial public health or consumer protection interest to be served.  Concluding that, *inter alia*, "the public does not have an interest in giving funeral directors a monopoly over end-of-life

45

discussions," the Court granted preliminary injunctive relief.  Today, as in the past, funeral directors use their captive state licensing boards to protect "their" local markets against competition.

120.    Even where funeral directors are not granted self-regulatory powers, they have a well-heeled and powerful lobby. In Minnesota, the licensing regime for funeral directors and establishments falls under the Department of Public Health.  In 2013, after the Minnesota Funeral Directors Association successfully lobbied against the Department of Health's proposal to eliminate its funeral establishment embalming room requirement for branch locations, a proprietor seeking to open a local office where no embalming would ever take place (to better serve a minority community) sued to challenge the branch location embalming room requirement. In *Stoll v. Minn. Dep't of Health*, 2013 Minn. Dist. LEXIS 183 (D. Minn. October 9, 2013), in a case where no claim of interference with a fundamental right was made, the district court struck down the requirement's application under the Due Process clause of the Minnesota Constitution, finding that its application to plaintiff's planned branch location was not rationally related to a legitimate government purpose. The Minnesota Funeral Directors Association's opposition to the state's proposal to remove the barriers to market entry is typical of the industry on national basis. The problem is magnified in states like Delaware, which puts licensing and enforcement in the hands of a board dominated by commercial funeral directors.

121.    Another relatively recent example is the Sixth Circuit's decision in *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). The Tennessee Board of Funeral Directors and Embalmers had issued cease and desist orders to plaintiff's Tennessee casket selling businesses because they were offering lower prices for caskets than Tennessee funeral directors. The Tennessee Board charged that the casket sellers were engaged in "funeral directing" without employing any

46

licensed funeral directors. The Tennessee funeral director law's definition of funeral directing swept casket sellers within its scope. The Sixth Circuit affirmed the district court's judgment enjoining application of the Tennessee funeral director law to plaintiffs' businesses on due process and equal protection grounds, finding that the Tennessee Board's purported public health and consumer protection justifications were transparently pre-textual:

> No sophisticated economic analysis is required to see the pretextual nature of the state's proffered explanations ......... We are not imposing our view of a well-functioning market on the people of Tennessee. Instead, we invalidate only the General Assembly's naked attempt to raise a fortress protecting the monopoly rents that funeral directors extract from consumers. This measure to privilege certain businessmen over others at the expense of consumers is not animated by a legitimate governmental purpose and cannot survive even rational basis review.

*Id.*, 312 F.3d at 229. Courts have readily recognized that self-regulating funeral directors will use the power the State gives them to protect licensed funeral directors from competition. Even when no fundamental right, such as the free exercise of religion, is at stake, such anticompetitive regulation fails to pass even rational basis scrutiny.

122. But given the deep historical and cultural roots of American funerary practices in religion, it comes as no surprise that the emergence of the American commercial funeral director profession has created conflicts with the traditional role of clergy. *See* Cecil D. Bradfield and R. Ann Meyers, "Clergy And Funeral Directors: An Exploration In Role Conflict," 21 Review of Religious Research, No. 3 (Summer 1980), pp. 343-50. Regulatory capture by the commercial funeral industry has exacerbated the conflict, especially with respect to religious minorities such as Jews and Muslims who reject embalming on religious grounds.

123. In one case bearing a striking resemblance to the present action, *Wasserman v. Burrell*, 2012 U.S. Dist. Ct. Motions LEXIS 3007 at *1 (M. D. Pa. December 17, 2012) (CONSENT DECREE), the Pennsylvania State Board of Funeral Directors, based on complaints

47

purportedly initiated by Pittsburgh area licensed funeral directors, caused the Board of

Professional and Occupational Affairs and the Bureau of Investigation and Enforcement to

commence an investigation against Orthodox Jewish Rabbi Daniel E. Wasserman, based on the

allegation that he had conducted traditional ritual Jewish cleansing, prayer and burial rites on a

non-commercial, charitable basis for several members of the Jewish community and that he had

done so even though "[n]o licensed Pennsylvania funeral director was present." According to the

complainants, the Rabbi's actions constituted "the unlicensed practice of funeral directing" under

a Pennsylvania statute carrying criminal penalties of up to $1,000 or imprisonment up to one

year, or both. After leaving the investigation open for 28 months, the State informed Rabbi

Wasserman that the Bureau of Investigation and Enforcement had decided, on behalf of the

Board of Funeral Directors, to defer formal prosecution, while reserving the right to reopen the

matter if it obtained additional information.

124.   Apparently, the Department of State told the funeral director complainants that

"[t]he Respondent has been warned that any future violation of the Funeral Director Law will

launch a full prosecution by this Office." The *Wasserman* case was resolved via Consent Decree

that so long as they remained non-commercial in nature, services provided by Rabbi Wasserman

would not be interpreted to constitute the unlicensed practice of funeral directing. *Id.*

125.   Maryland recently enacted legislation in 2007 to address the burden on free

exercise of Muslim funerary practices imposed by its prior funeral director laws. As David Foos

recounts:

> A strong Ready-to-Embalm scheme existed in Maryland, with licensure as
> a funeral director and ownership of a funeral home predicated upon
> completion of a mortuary science program that included the embalming of
> at least twenty bodies. However, after the election of the first Muslim in
> the Maryland House of Delegates, attention was drawn to the inequity this
> created on religions that did not permit embalming. To rectify this

48

> problem, Maryland created a funeral director's license that allowed for an individual to obtain licensure to practice all aspects of funeral direction except for embalming. In this way, Maryland did not have to sacrifice the licensing requirements in its existing mortician's license, yet it simultaneously afforded individuals the opportunity to "practice in a way that is most fitting to their culture or religious belief." The funeral establishment license was similarly amended to allow for holders of the funeral director's license to own funeral homes.

Foos, 2012 Mich. St. L. Rev. at 1390 and nn. 127-132. A similar change could benefit Delaware, whose current laws forbid the licensure of Muslims who are unwilling to sacrifice their deeply held religious beliefs, for no legitimate reason, much less a compelling one.

### *The Delaware Public Health/Vital Statistics Law and Regulations*

126.    Delaware law establishes an overarching statutory scheme for the disposal of human remains. That scheme requires an official record of death before human remains can be cremated or interred. This scheme is set forth in the statutes relating to The Delaware Department of Health and Social Services ("DHSS"), Division of Public Health Office of Vital Statistics, and related regulations.

127.    The DHSS "has charge of the registration of . . . deaths . . . and shall prepare the necessary methods, forms and blanks for obtaining and preserving such records and insuring the faithful registration of the same throughout this State and in the central Office of Vital Statistics." 16 Del. C. § 3102(a). DHSS is responsible for "the uniform and thorough enforcement of this chapter throughout the State and shall from time to time promulgate any additional forms and regulations that are necessary for this purpose." *Id.* § 3102(b).

128.    Title 16, Chapter 31, Subchapter II, Section § 3123(a) addresses the death certificate requirement, providing that

> A certificate of death for each death which occurs in this State shall be filed with the Office of Vital Statistics, *__or as otherwise directed by the State Registrar__*, within 3 days after death . . . , and prior to final

49

> disposition of the dead body, and shall be registered if it has been
> completed and filed in accordance with this section.

(emphasis added). The emphasized language indicates that the ""State Registrar," which is the

Director of the Division of Public Health, *see* 16 Del. C. §3105,  has the authority to direct that

the death certificate be filed "otherwise" than as set forth in Section 3123(a).

129.    Section 3123(b) provides that:

> The funeral director who assumes custody of the dead body shall file the
> certificate of death with the Office of Vital Statistics unless an official
> death investigation is required. The funeral director shall obtain the
> personal data from the next-of-kin or best qualified person or source
> available and send that data to the attending physician or medical
> examiner for certification.

Section 3123(b) does not indicate who must file the certificate of death when no funeral director

assumes custody of the dead body.

130.    Alternatively, Section 3123(d) provides that in specified situations, the death

certificate is to be filed not by a funeral director, but instead by the medical examiner. Section

3123(d) states that when "an official death investigation is required pursuant to §  4706(a) of

Title 29, the medical examiner shall assume custody of the dead body, determine the manner and

cause of death and shall complete and sign the certificate of death and shall file the certificate of

death with the Office of Vital Statistics." Section 4706(a) of Title 29 mandates an official death

investigation in specified circumstances, including "if there is any unclaimed body or if anybody

is to be cremated." Accordingly, if no funeral director "assumes custody of the dead body," then

"there is an[] unclaimed body," an "official death investigation is required pursuant to § 4706(a)

of Title 29," and in that situation Section 3123(d) requires the medical examiner to file the death

certificate.

131.    Section 3123(e) covers situations in which the cause of death cannot be

determined within 24 hours after the death occurred. This section requires "the attending

physician or medical examiner" is required to file a "pending certificate of death." Afterwards, when the cause of death is finally determined, Section 3123(e) states that a "revised certificate of death shall be issued and presented to the funeral director ***or the funeral director's agent***, who in turn shall file the certificate with the Office of Vital Statistics." *Id.* (emphasis added).[4] Section 3123(e) does not indicate who must file the revised certificate of death when there is no funeral director involved. The State Registrar's authority under Section 3123(a) to direct that the certificate of death be filed "otherwise" appears to fill this gap. Not surprisingly, the regulations adopted by the Division of Public Health provide that a licensed funeral director need not file the death certificate in situations where either personal information or cause of death information is not immediately available—in both such cases, either a funeral director or a "person acting as such" may file the completed death certificate. *See* 16 Del. Admin. Code 4000.4205.7.1.1-2; 7.2.1.

132.    Section 3123(i) provides that "[a]ll certificates of death shall be electronically filed with the Delaware Vital Events Registration System (DelVERS)." Thus the DelVERS online system is the exclusive facility through which a death certificate can be filed for deaths occurring in Delaware, and accordingly is the exclusive facility through which the process leading to issuance of a Burial-Transit permit can be initiated.

133.    In Subchapter III, the statutory section immediately following the Vital Statistics provisions, Delaware law prescribes requirements for the disposal of dead bodies. State law provides that "[w]hen a death or fetal death occurs or a dead body is found, the body shall not be disposed of until the burial/transit permit is completed." 16 Del. C. § 3151 (the "Burial Permit

---

[4] Note that the highlighted language is different than, and was intended to mean something different than, the phrase "person acting as such," as used in Section 3151. *See* discussion below.

Requirement"). The "permit is required to accompany the body and is to be: (1) Given to the sexton of the cemetery when the body is interred; (2) Retained by the funeral director when the cemetery has no sexton; [or] (3) Retained with the ashes in cases of cremation, or by the funeral director if so desired."[5] Section 3151 does not contain language mandating that the burial/transit permit be issued only to a licensed funeral director.

134.    The next provision, 16 Del. C. § 3152, provides that "[n]o common carrier shall receive for shipment from any point within this State to any other point either within or without this State any dead human body, unless the funeral director ***or person acting as such*** presents a completed burial/transit permit as provided in § 3151 of this title." (emphasis added). Note that Section 3152 contemplates that either of two different persons may address the burial/transit permit requirement—"the funeral director or person acting as such."

135.    As demonstrated by the statement of Office of Vital Statistics Management Analyst Nicholas Cruz in June 2022, when he denied Imam Mahmood's access to the DelVERS system, the Department of Public Health Office of Vital Statistics applies the "person acting as such" formulation when determining access to the DelVERS system for the purpose of filing death certificates. Mr. Cruz stated to Imam Mahmood in his June 23, 2022 email: "You are not licensed as a funeral director and ***are not acting as such***. Accordingly, you are not able to electronically file a death certification as a result." (emphasis added). Mr. Cruz did not explain his reasoning in determining that Imam Mahmood was not "acting as such," when he denied Imam Mahmood access to DelVERS.  Moreover, the "person acting as such" formulation does

---

[5] Title 16, Section 3111(b) (2) imposes a penalty of "not more than $1,000, or imprisonment of not more than 1 year, or both" for "[a]ny individual who willfully and knowingly transports or accepts for transportation, interment or other disposition a dead body without an accompanying permit as provided in this chapter or regulations adopted hereunder."

not refer to "the funeral director's agent," since that express reference to agency is used in Section 3123; the General Assembly's use of different terms within the same statute indicates the intention of different meanings.

136.    The Department of Health and Social Services regulations governing care and transportation of the dead appear at 16 Del. Admin. Code 4204. Section 4204.1 defines "Funeral Director" as "an Undertaker or Mortician licensed in the State of Delaware." Section 4204.2 provides, in pertinent part, that no person in charge of premises where interments or cremations are made shall permit any such disposition of a dead body "unless it is accompanied by a burial permit or cremation permit or a temporary certificate authorizing burial, signed by a licensed funeral director." Section 4204.3 provides, in pertinent part, that dead human bodies that will be kept longer than 24 hours before burial must either be embalmed or "stored in in suitable, approved refrigeration facilities."

137.    Section 4204. 6 of the regulations contains provisions addressing the transport and disposal of bodies dead of designated high risk diseases, and also contains a general provision under which the Director of Public Health (or a designee) my waive any provision of the regulations "in order to accommodate religious or traditional practices if he or she is satisfied that the proposed practices present no substantial additional risk to any person or the environment."

138.    This provision contemplates a process with several steps—first, a person seeking such a waiver must make a request for a waiver to accommodate religious or traditional practices; second, the Director of Public Health (or a designee) must make a determination of whether the proposed practices present any additional risk to any person or to the environment; and third, if any such additional risk is found to exist, the Director of Public Health (or a

designee) must determine whether that additional risk is "substantial."  When the Office of Vital Statistics denied Imam Mahmood's application for access, the Vital Statistics officers did not mention that the Office had the authority to grant a waiver "to accommodate religious . . . practices."

139.    Subsection 6.4 requires the persons handling a body dead of a designated high risk disease "shall follow strict universal precautions [to be provided by the Office of Vital Statistics] in a manner that minimizes contact between the body, other persons, and the environment." Under subsection 6.5, the burial of a body dead of a designated high risk disease must be in a sealed casket and at a depth of at least 79 inches. Under subsection 6.7, embalming of such a body is prohibited unless specially authorized by the Medical Examiner.  For shipment of bodies where the person died of a non-contagious disease, Subsection 7.0 requires an approved sealed container and provides that if the body is to be removed from the state by common carrier, that the carrier secure a transit permit from the Office of Vital Statistics.

140.    Subsection 8 provides that a "burial-transit permit will be issued by the Office of Vital Statistics upon the compliance of the funeral director with the provisions of Section 7 and the presentation of the death certificate."

141.    Title 16, Del. Admin. Code Section 4205 specifically addresses the Office of Vital Statistics. Section 4205, subsection 7.0 addresses Death Registration. The regulations specifically address the procedures applicable to completing death certificates on a "pending" basis when not all of the required information is available, supplementing the "pending" certificate within 30 days, and the Hospital's role in preparing death certificates. In each case, the regulations provide for two alternatives: either the funeral director must act, or a "person acting as such" must do so.

142.     The "person acting as such" reference is repeated in several places in the Division of Public Health's regulations. *See* Title 16, Del. Admin. Code Section 4205, subsections 7.1.1, 7.1.2, 7.2.1, and 7.3.3. Similarly, Title 16, Del. Admin. Code Section 4205, subsections 12.1.1 and 12.1.2, addressing delayed certifications of death, contain the same alternative formulation of who must act—the "funeral director" or the "person who acted as such." The regulations do not provide criteria for determining when a person is "acting as such" or "acted as such."

143.     The Office of Vital Statistics will issue a burial-transit permit only if it is presented with an official record of death. Pursuant to 16 Del. Admin. C. § 4204-8.0, "A burial-transit permit will be issued by the Office of Vital Statistics upon the compliance of the funeral director with provisions of Section 7 and the presentation of a death certificate."  This regulation does not, by its terms, apply to the numerous situations described above in which Delaware's Public Health laws and regulations provide that a person other than a licensed funeral director is authorized to act with respect to death certificates.

***The Delaware FDL and the Delaware Board's Regulations***

144.     The Delaware FDL is codified at Title 24, Chapter 31 of the Delaware Code. Section 3100 sets forth the purpose and authority of the Board of Funeral Services, providing that:

> (a) The primary objective of the Board of Funeral Services, to which all other objectives and purposes are secondary, is to protect the general public, specifically those persons who are the direct recipients of services regulated by this chapter, from unsafe practices and from occupational practices which tend to reduce competition or fix the price of services rendered.
>
> (b) The secondary objectives of the Board are to maintain minimum standards of practitioner competency, and to maintain certain standards in the delivery of services to the public. In meeting its objectives, the Board shall:
>
> (1) Develop standards assuring professional competence.

55

(2) Monitor complaints brought against practitioners regulated by the Board.

(3) Adjudicate at formal hearings regarding complaints brought against practitioners regulated by the Board.

(4) Promulgate rules and regulations.

(5) Impose sanctions where necessary against practitioners, both licensed and formerly licensed.

145.     Section 3101 sets forth definitions of terms used in the chapter. 24 Del. C. § 3101(7) provides that "'Funeral director' shall mean a person engaged in the care of human remains or in the disinfecting and preparing by embalming of human remains for the funeral service, transportation, burial, entombment or cremation, and who shall file all death certificates or permits as required by Chapter 31 of Title 16."

146.     While this remarkable definition appears to grant licensed funeral directors the exclusive right to file and otherwise act with respect to death certificates and related permits, it stands in direct conflict with the statutes discussed above which permit various persons, other than a licensed funeral director, to file and otherwise act with respect to death certificates and related permits.

147.     24 Del. C. § 3101(8) provides that "'Funeral establishment' shall mean any place used in the care and preparation of human remains for funeral service, burial, entombment or cremation; said place shall also include areas for embalming, the convenience of the bereaved for viewing and other services associated with human remains." This Section provides for an explicit exemption for the embalming room requirement: "Satellite funeral establishments existing as of May 12, 1988, shall not be required to include an area for embalming." If the embalming room requirement for satellites is supported by any public health or safety interests, this "grandfather clause" would completely undermine them.

148.    24 Del. C. § 3101(9) provides that "'Funeral services' shall mean those services rendered for the disinfecting, embalming, burial, entombment or cremation of human remains, including the sale of those goods and services usual to arranging and directing funeral services."

149.    24 Del. C. § 3101(13) provides that ""Practitioner' shall mean a funeral director."

150.    Section 3102 creates and describes the composition of the Delaware Board of Funeral Services. Under 24 Del. C. § 3102(a), the Board of Funeral Services, a body consisting of 7 Delaware residents who are Delaware-licensed commercial funeral directors, and three "public members, is "created . . . which shall administer and enforce this chapter [31]." Subsection (k) prohibits all of the Board members from "in any manner whatsoever discriminat[ing] against any applicant or person holding or applying for a license to practice funeral services by reason of sex, race, color, age, creed, or national origin." Under 24 Del. C. § 3103(c), the Board's quorum is a simple majority of its members which need not include any public members, and no disciplinary action may be taken without the affirmative vote of 4 board members, again with no requirement that the affirmative vote of any public member be obtained.

151.    Effectively, Section 3102 cedes and delivers regulatory authority over the funeral director profession to the funeral directors themselves. The Delaware FDL is thus an example of the prevailing regulatory capture of the American funeral industry described above.  Although the statutes state that the consuming public is the constituency to be protected and served by the self-regulating boards and bodies created by these laws (see, e.g., 24 Del. C. § 3100, discussed above), the reality is that they consider the licensed funeral directors to be their primary constituency, and have consistently acted to protect their group from competition through enforcement activity and by opposing any legislation that would erode their control of their protected market.

152.     Section 3105 establishes the boundaries of the Delaware Board's authority. 24 Del. C. § 3105 sets forth the powers and duties of the Board, including, *inter alia*, adopting regulations, establishing minimum education, training and experience requirements for licensure applicants, issuing funeral director licenses to qualified applicants, establishing minimum requirements and issuing permits for funeral establishments, and referring complaints concerning practitioners, the Board's practices, or practices of "the profession" to the Division of Professional Regulation for investigation.  The Board's express authority under Section 3105 does not include charging, investigating, or disciplining persons who are not "practitioners," *i.e.,* funeral directors or former funeral directors. With respect to unlicensed persons, the Board's authority is limited under 24 Del. C. § 3113(b) to issuing a warning if it has been determined that "***an individual*** is engaging or has engaged in the practice of funeral services, or is using the title 'funeral director' and is not licensed" under Delaware law, and then, only after such a warning has been issued, the Board is authorized to "apply to the Attorney General to issue a cease and desist order." In connection with the complaint made against DMFH that was attached to the Division of Professional Regulation's March 30, 2023 letter, the Board circumvented these limitations on its authority by having the complainant's name redacted, when in fact the complainant, on information and belief, was Board Secretary (and former Board President) Nicolas Picollelli, a named defendant in this action, acting pursuant to the Board's plan to shut down activity by Plaintiff, or a person acting with his knowledge and at his behest. Accordingly the complaint should be stricken as a legally *ultra vires* action of the Board, the authority of which is limited as described above.

153.     Section 3107 sets forth the statutory requirements for licensure as a funeral director.  Among these requirements is completion of an internship in Delaware 24 Del. C. §

3107(4).  Under regulations promulgated by the Board, the internship requirement includes the performance by the intern of not less than 25 human embalmings.  See 24 Del. Admin. Code §3100. 2.5. Under Section 3107, the Board must waive the internship requirement, including the entirety of the embalming experience requirement, if the applicant has been unable to obtain such an internship after contacting 20 firms within 6 months and the Board is unable, within an additional 6 months, to facilitate the applicant's placement as an intern.

154.    This explicit exemption undermines any argument that the Board's imposition via 24 Del. Admin. Code §3100. 2.5 of the embalming requirement serves a legitimate state interest in the health and safety of the general public or of individuals who perform embalmings.

155.    Any exemption granted pursuant to this statutory section would undermine any such state interests to a degree not less than granting Plaintiff Imam Mahmood an exemption based on his firmly held Muslim religious beliefs.

156.    Section 3112 sets forth the limited disciplinary authority of the Delaware Board. Under 24 Del. C. § 3112, the Board's disciplinary jurisdiction is expressly limited to licensees and former licensees. Among the grounds for discipline are that the subject funeral director "allowed another person to use that practitioner's license, or aided or abetted a person not licensed as a funeral director to represent himself or herself as a funeral director." 24 Del. C. § 3112(a)(1). This provision enables the Board to threaten disciplinary action against any licensed Delaware funeral director who renders assistance to Plaintiff in obtaining death certificates and burial/transit permits necessary to exercise his religion through cleansing, shrouding, prayer and burial of deceased Muslim congregants. Such threats, or the fear of such discipline, has been the direct and substantial cause of the eventual loss to Imam Mahmood of assistance, from a series of good-willed Delaware funeral homes, in obtaining the death certificates and permits necessary

for Plaintiff to provide the traditional religious Muslim ritual cleansing, shrouding, prayer and burials that are his mission.

157.    As mentioned above, 24 Del. C. § 3113(b) mandates that when "it is determined that an individual is engaging or has engaged in the practice of funeral services, or is using the title "funeral director" and is not licensed under the laws of this State, the Board shall apply to the Attorney General to issue a cease and desist order, after formally warning the unlicensed practitioner in accordance with this chapter."

158.    Although the DMFH received a letter from the Division of Professional Regulation attaching a complaint alleging "unlicensed activity" by DMFH, the procedures of Section 3113(b) were not followed. There is no indication that anyone has "determined" DMFH or anyone associated with it has engaged in the unlicensed practice of funeral services or has used the title "funeral director." No formal warning has ever been issued to DMFH, as required by section 3113(b). No cease and desist order has been received by DMFH or Plaintiff. In fact, neither DMFH nor Plaintiff has ever received anything other than the March 30, 2023 letter and complaint. The Division of Professional Regulation has never responded to the letter of Plaintiff's counsel answering the complaint forwarded to DMFH by the Division. Nor have any hearings been scheduled with respect to the complaint. It appears that the Board and the Division are letting the complaint remain unprocessed, unprosecuted, and unresolved, so that neither DMFH nor Plaintiff will have any avenue to obtain a ruling or to appeal an adverse ruling, and so that the *in terrorem* effect of the complaint will discourage Plaintiff's pursuit of his mission, and will reinforce the threat of enforcement action against any Delaware funeral home who renders assistance.

60

159.    Section 3117 is the statutory provision addressing the requirements for funeral establishments. Subsection (a) sets forth the circumstances under which the Board shall issue a funeral establishment permit, which include "fulfillment of all standards set by the Board by regulation," certification under oath that the building meets the requirements for a funeral establishment "as defined in Section 3101," that the funeral establishment shall "have in charge full time therein" a licensed Delaware funeral director, the property is properly zoned, and that the establishment has acquired the appropriate business licenses issued by the Delaware Division of Revenue. The requirement for an embalming area is imposed in the statute's definition section, at 24 Del. C. §3101(8), and is supplemented by the Board's regulations, at 24 Del. Admin. Code §§ 3100.4.2 and 3100.14.1.13. Subsection (b) of 24 Del. C. § 3117 prohibits operation of a funeral establishment unless a permit "for each such establishment" has been issued by the Board. Subsection (c) provides for the biennial renewal of funeral establishment permits by the Board. Subsection (d) prohibits the funeral establishment applicant from permitting "the unauthorized practice of funeral services, personally or by agents, on or off the premises of said funeral establishment." Subsection (g) provides that in cases where multiple locations in Delaware are operated under the same trade name or owned by the same owner, at least one of the locations must maintain an embalming area.

160.    Section 3118 sets forth exemptions for persons licensed in another jurisdiction to transport and bury human remains from outside of Delaware; for interns; for funeral directors commissioned by any of the United States armed services or Public Health Service; and for administrative and management personnel who are "under the direct supervision of a license [sic] funeral director." 24 Del. C. § 3118. However, as discussed herein, there are numerous additional exemptions, both by express statute or regulation, and by ad hoc practice.

161.    Criminal penalties are codified at 24 Del. C. § 3123. Pertinent here, Section 3123(a)(1) provides that a person is guilty of a misdemeanor if, while not licensed in Delaware, engages in the practice or funeral services, or "uses that person's name or otherwise uses or assumes any title or description conveying or tending to convey the impression that the person is qualified to practice funeral services." Conviction of a first offense carries the penalty of a fine of $500 to $1000 for each offense, and subsequent offenses are subject to a fine of $1000 to $2000 for each offense.

162.    The Board's regulations appear at 24 Del. Admin. Code § 3100. Section 3100.2.5 sets forth the Board's requirements for the internship required in order to be granted a full license other than by reciprocity.  This section includes the requirement that such a prospective licensee's internship shall include "a minimum of twenty-five embalming reports," which means the intern must participate in 25 embalmings. In addition, the educational requirements for such licensure are stated as "an Associate degree or its equivalent in mortuary science," which in all events requires at least 30 semester hours of mortuary science credits from "a school or college fully accredited by the American Board of Funeral Service Education." On information and belief, the American Board of Funeral Service Education is controlled by the commercial funeral director industry, and has never granted accreditation to a program that does not require a full battery of coursework in embalming. Accordingly, effective relief for Plaintiff herein will necessarily address the absence of a regulatory pathway to obtain the educational credentials for licensure without training in embalming.

163.    The Board's funeral establishment permit requirements are set forth at 24 Del. Admin. Code § 3100.4. Section 3100.4 requires that a funeral establishment must "have a licensed funeral director in charge full time therein," unless "exempt under 24 Del. C.

§3117(a)(2)." Here again, the exemption set forth under 24 Del. C. §3117(a)(2), which is a grandfather clause for "funeral establishments maintained, operated, or conducted prior to September 6, 1972," would undermine any state interest based on public health or consumer protection concerns not less than an exemption to plaintiff based on his firmly held religious beliefs. This regulation also requires a funeral establishment to have a preparation room with the "the fixtures necessary for the care and preparation of human remains for funeral service, burial, entombment or cremation," including, "at a minimum, embalming machine and table, aspirator, embalming instruments, embalming fluids, an operating drainage system, syringes, needles and surgical supplies and an operating ventilation system." 24 Del. Admin. Code § 3100.4.2. The embalming machine requirement is further established by the Board's funeral establishment inspection regulations, which require a "preparation room with a working embalming machine, embalming table, aspiration device, surgical instruments and embalming fluids customary for use during an embalming procedure." 24 Del. Admin. Code § 3100.14.1.13.

164.   The Delaware FDL, and the related provisions of Delaware's Public Records Law, and the associated regulations are, as applied to Plaintiff, unconstitutional under both the federal and Delaware Constitutional guarantees of the free exercise of religion and equal protection of the laws.

165.   The Delaware Funeral Director Law has been interpreted by the Delaware Attorney General's Office to exclude Plaintiff's traditional Muslim funeral activities from its definition of the "practice of funeral service." Delaware Attorney General Opinion No. 87-1003, 1987 Del. AG LEXIS 37. The statute's language was slightly different then, but the differences are immaterial.  The Attorney General's opinion concluded that

a.   The burial does not constitute the practice of funeral service;

      b.      Transporting the remains does not constitute the practice of funeral service.

      c.      The funeral service itself does not constitute the practice of funeral service.

166.    The Attorney General's opinion concluded that "A person engaged  in the practice of funeral service, therefore is one who disinfects and embalms the human dead for the purpose and intent of preparing the human dead for the funeral service, transportation, and burial,  but does not include the actual funeral service, transportation, or burial. The actual transportation, burial, and cremation of the human dead itself is not the "practice of funeral service." 1987 Del. AG LEXIS 37 at *5.

167.    Plaintiff's activities are precisely what the Attorney General's opinion excluded from the definition of the practice of funeral service: transportation, the funeral service at the Mosque, which includes the cleansing and shrouding and prayer, transportation to the cemetery, and burial. Yet to file a death certificate or sign a burial permit, a funeral director's license is required. See 1987 Del. AG LEXIS 37 at *6.

168.    But it is unclear why this is so; the Attorney General's opinion observes that an "undertaker," a term not defined in the opinion, "must be registered with the registrar of the Bureau of Vital Statistics." Nevertheless, although the State Division of Public Health has jurisdiction to regulate the Care and Transportation of the Dead, and also has jurisdiction over the Office of Vital Statistics and registers undertakers, it has delegated its authority to licensed funeral directors to issue the permits required for transport and burial of human remains. In so delegating its authority, the Division leaves out Muslims, who cannot become Delaware-licensed funeral directors without sacrificing their sincerely-held religious beliefs.

169.    This constitutes a severe burden on Plaintiff's free practice of his religion, not justified by any rational state purpose. No "embalming or disinfecting," which constitutes the

"practice of funeral services," are required in the case of funerals conducted by Plaintiff. And because Plaintiff does not "keep" human remains for more than 6 hours before burial, the Division of Public Health's regulations do not even require refrigeration. Accordingly, no services offered by a funeral director are required to protect the public health. Delegation of the Division of Public Health's authority to issue permits to licensed funeral directors therefore, as applied to Plaintiff, serves no public health purpose. The only function served by the delegation is to grant licensed funeral directors a protected market enabling them to collect an unearned and economically unreasonable surcharge before Muslims may engage in their funeral rites and bury their dead.

170.    Plaintiff's constitutional rights to the free exercise of his religion and to equal protection of the laws require that he be exempted from such irrational and unreasonable surcharges. Granting such an exemption is within the authority of the Director of the Division of Public Health and State Registrar of Vital Statistics.  All that would be required would be to grant Plaintiff Imam Mahmood access to DelVERS for the purpose of filing death certificates and obtaining signed Burial-Transit Permits.  If the Division wishes to be assured that the room at the Mosque used for the ritual cleansing and shrouding is appropriate and equipped to protect the health of those who use it, it can obtain that assurance in the process of granting the exemption. The Board of Funeral Services should have no part in this process, because the Board's purpose, in practice, is to protect the commercial interests of its licensees, presenting a clear conflict of interest.

### The Delaware Funeral Director and Related Public Health and Vital Statistics Laws are Unconstitutional

171.    The Delaware Funeral Director Law and related public health and vital statistics laws, by purportedly requiring that only a licensed funeral director trained in embalming and

practicing at an establishment equipped for embalming may file a death certificate and thereby

obtain a burial/transit permit, violates the Free Exercise Clause of the First Amendment to the

Constitution of the United States. Such laws are not neutral, as they discriminate against

religions that believe embalming to be a desecration of the human body. Such religions include

not only the Islamic faith of Plaintiff herein, but also Orthodox Judaism, and the Baha'i Faith.

172.    Further, such laws are not generally applicable, as they are subject to various

exemptions.

173.    First, regulations adopted by the Division of Public Health explicitly establish a

system of individualized exemptions. The interrelated Vital Statistics and Public Health laws

pertaining to certifications of deaths and the handling and disposition of human remains fall

under the regulatory administration of the Director of the Division of Public Health, who is also

the State Registrar of Vital Statistics. See 16 Del. C. §§3102(a) and (b); 3105. The Division

Director/State Registrar is empowered to direct, in an individual case, how the death certification

and burial transit permit requirements are carried out. 16 Del. C. § 3123(a). The Division

Director/State Registrar has adopted an explicit regulation under which exemptions to the

standard requirements and practices can be applied for on a case by case basis. Under Title 16,

Section 4204. 6 of the regulations, the "Director of Public Health (or a designee)" may waive any

provision of the regulations "in order to accommodate religious or traditional practices if he or

she is satisfied that the proposed practices present no substantial additional risk to any person or

the environment."

174.    It is unclear why Plaintiff Imam Mahmood was not informed of the individualized

exemption provisions of the Division's regulations when he was denied access to the DelVERS

system.  The Division Director/State Registrar is statutorily charged with the responsibility for

"the uniform and thorough enforcement of this chapter throughout the State" 16 Del. C. § 3102, to "supervise and control the activities of all persons when they are engaged in activities pertaining to the operation of the system of vital statistics," 16 Del. C. § 3105(2) and must "[c]onduct training programs to promote uniformity of policy and procedures throughout the State." 16 Del. C. § 3105(3).  Despite these provisions, and despite the fact that the Vital Statistics administrators with whom he dealt had received—or should have received—such training, Imam Mahmood was instead referred to the Board of Funeral Directors, which has no authority to grant religious exemptions to the Public Health and Vital Statistics laws and regulations. And while funeral director licensure is within the Delaware Board's bailiwick, there is no viable path for a practicing Muslim, for whom embalming human remains is a sacrilege, to gain such licensure.

175.    Indeed, Imam Mahmood's case underscores why laws providing for individualized exemptions are subject to strict constitutional scrutiny—Delaware's system invites administrators to pick and choose whose religion is worthy of accommodation. Yet, any exemption from requiring a funeral director trained in embalming to certify the death and obtain the burial transit permit necessary for every burial would undermine any purported public health justification for this requirement to the same extent.

176.    In addition to this explicit system of individualized exemptions, numerous exemptions are implicated by several other statutory provisions.

**177.**    First, the Division Director/State Registrar is statutorily empowered to direct, in any given case, that the standard procedures not be applied. This safety valve is built right into the death certification statute.  Title 16, Section 3123(a) provides that "[a] certificate of death for each death which occurs in this State shall be filed with the Office of Vital Statistics, ***or as***

*__otherwise directed by the State Registrar,__* within 3 days after death . . . , and prior to final disposition of the dead body, and shall be registered if it has been completed and filed in accordance with this section." (emphasis added). This broad grant of authority permits the Division Director/State Registrar to direct that, in any given case, the procedures surrounding the filing of a death certificate and the permits that flow therefrom will bypass the procedure that usually applies. This statutory grant of authority supports the system of individualized exemptions contemplated by the Division regulations described above. However, the statutory grant of authority is not limited by the individualized exemption regulation.

178.    Second, not surprisingly, Delaware's licensed funeral directors are not required to be involved when there is no money to be made. Whenever a decedent's remains are abandoned, "an official death investigation is required pursuant to § 4706(a) of Title 29," and accordingly under 24 Del. C. § 3123(d) "the *__medical examiner__* shall assume custody of the dead body, determine the manner and cause of death and *__shall complete and sign the certificate of death and shall file the certificate of death__* with the Office of Vital Statistics." (emphasis added). Delaware's laws and regulations are silent regarding issuance of a burial/transit permit when no funeral director is involved, yet the burials nevertheless are permitted to occur. This scenario invites the Medical Examiner or another public health official to grant an ad hoc, individualized exemption from the "licensed funeral director" requirement whenever no funeral director shows up to collect the body. Of course, forcing grieving Muslims to abandon the remains of their deceased loved one just to obtain a permit for transportation and burial is unspeakably inhumane, and the real world dynamics at play will almost always result in the coerced hiring of a licensed funeral director at whatever price they quote, so long as funds can be obtained through charity or

at potentially great financial sacrifice.  Bear in mind, the traditional Muslim funeral and burial practices at issue here involve a swift service and an inexpensive, direct burial.

179.    Individual exemptions are also mandated by express provisions of the Funeral Director Law. Title 24, section 3108 requires the Board to issue a "limited license" to funeral directors validly licensed by another one of the United States, provided that a similar privilege is granted by that jurisdiction to Delaware licensed funeral directors. The "limited license" governed by Section 3108 is different than the unrestricted "license" based on reciprocity governed by 24 Del. C. § 3109.[6] The limited license governed by Section 3108 "will allow the licensee to make a removal of a dead human body in this State, return the body to another state or country, return dead bodies from another state or country to this State for final disposition, complete the family history portion of the death certificate, sign the death certificate in the licensee's capacity as a licensed funeral director, and execute any other procedures necessary to arrange for the final disposition of a dead human body." Under Section 3108, the Board is required to grant a limited license to a licensed Maryland funeral director with no embalming training or education, as permitted under Maryland's dual-track licensing statute. Doing so would undermine any purported public health benefit of tying the Title 16 death certification and related permit requirements to training and education in embalming to at least the same extent as granting a religious exemption to Imam Mahmood and the Mosque.

180.    Finally, the Funeral Director Law also contains a mechanism under which the Board can grant an individualized exemption from the internship requirement of participation in

---

[6] For a full license based on reciprocity, Section 3109(c) states that "An applicant from a state that separately licenses funeral directors and embalmers must have both licenses to qualify for licensure *__under subsection (b) of this section__*." (emphasis added). By its own terms, this requirement does not apply to the limited license mandated by Section 3108.

25 embalmings to qualify for the licensure that permits funeral directors to file death certificates and obtain burial transit permits. Title 24, Section 3107(a)(4) provides that the Board can waive the entire internship requirement if the applicant files an affidavit stating that after contacting 20 firms over a period of 6 months, the Board may determine whether the applicant has pursued an internship to his or her "fullest ability," in which case if the Board is unable to arrange an internship within 6 months after receiving the affidavit, it must issue the license if the applicant has satisfied all requirements other than the internship. The Board's authority to determine if the applicant tried hard enough to obtain an internship invites the Board to grant or deny the individual an exemption. The authority to grant such an exemption, which would undermine any public health rationale for the embalming experience requirement at least to the same extent as granting a religious exemption to the requirement, demonstrates that any such purported public health rationale is pretextual.

## CAUSES OF ACTION

### Count I

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Not Neutral**

181.    Plaintiff incorporates by reference all preceding paragraphs.

182.    A law that incidentally burdens religion is subject to strict constitutional scrutiny if it is not neutral. Delaware's restriction of access to the DelVERS system to licensed funeral directors is not neutral because it excludes Muslims. The DelVERS system is the sole means to file a death certificate and thereby obtain a burial-transit permit to perform a lawful burial. Licensure as a funeral director under Delaware law requires that the applicant receive training and education in embalming, including performing not less than 25 embalmings.

70

183.    Muslims believe that embalming is a desecration of the human body which is forbidden. They are thus unable to obtain licensure as a funeral director in Delaware, and therefore are excluded from access to the DelVERS system. This exclusion prevents them from lawfully performing traditional Muslim funeral rites and burials. Such rites and burials are Plaintiff Imam Mahmood's duty to perform as Imam of the Mosque, especially when the family and friends of the deceased are unable to afford the financial burden of hiring a non-Muslim funeral director.

184.    Delaware law does not prevent clergy of other religions, which do not forbid embalming, from obtaining licensure as funeral directors and the access to the DelVERS system that comes with licensure. Such clergy can thus perform the rites and burials (or other dispositions, such as cremation) of their religion or cultural tradition without need to hire a licensed funeral director when the financial means to do so are unavailable. Accordingly, the relevant Delaware laws and regulations are not neutral with respect to religion.

185.    Restricting access to the DelVERS system to licensed funeral directors, and thus excluding Muslims, does not serve any rational, legitimate, compelling, or other governmental purpose. Even if such a purpose existed, restricting access to the DelVERS system to licensed funeral directors, and thus excluding Muslims, is not the least restrictive means of serving any such purpose. For example, if Delaware's concern was protecting people from public health risks, a less restrictive means to serve such a purpose would be to designate a properly trained official to (a) grant access to the DelVERS system in order to file death certificates and obtain burial-transit permits upon determination that such access presents no substantial additional risk to any person or the environment, or (b) to file death certificates and issue burial-transit permits

71

to the person responsible for interment in cases in which no licensed funeral director is hired and no substantial additional risk to any person or the environment would be created by doing so.

186.    Further, the complaint instigated by the Delaware Board against DMFH, for purportedly, through Plaintiff's activities, "[p]racticing without a funeral establishment permit and a licensed funeral director" is not neutral with respect to religion, discriminating against Muslims due to their sincerely held religious belief that embalming is forbidden as a desecration of the human body. Application of Delaware's establishment permit requirements, namely the requirement that the facility have a room equipped for and dedicated to the sacrilegious practice of embalming, and that the facility be under the supervision of a licensed Delaware funeral director trained and experienced in embalming effectively prohibits Imam Mahmood's activities and forbids him from acting to fulfill his religious and charitable mission.  The Delaware Board's deliberate use of the complaint to threaten regulatory and/or criminal sanctions against Plaintiff's practice of his religion, and against any licensed funeral director who assists him in doing so, is not neutral, inasmuch as Delaware has not taken such action against any religious group other than Plaintiff's as a Muslims due to his Muslim beliefs pertaining to embalming. Other religious groups in Delaware are not subject to such discriminatory enforcement; only plaintiff, as a Muslim, and due to his beliefs as a Muslim, has been subject to such treatment by the State, through the actions of Defendants under color of state law.

187.    Defendants' discriminatory actions against Plaintiff as described herein are not compelled by any legitimate state interest. Indeed, embalming is not required by any state law or regulation,[7] and thus the requirement of training in embalming and the maintenance of a facility

---

[7] In all cases, Delaware prohibitions against the holding of unembalmed human remains beyond 24 hours may be obviated by refrigeration.

equipped for embalming does not serve any public health purpose, consumer protection purpose, or any other legitimate state purpose. These requirements serve only to grant a monopoly to licensed funeral directors. Nor is such discriminatory enforcement the least restrictive means to promote any legitimate State interest.

188.    Plaintiff is irreparably harmed by the non-neutral application of Delaware's Vital Statistics, Public Health, and Funeral Director laws to prevent him from filing death certificates and obtaining the requisite burial-transit permits to bury the Muslim dead in cases in which the family and friends of the deceased are unable to afford the financial burden of hiring a non-Muslim funeral director, and by the non-neutral, discriminatory enforcement of Delaware's funeral director licensing and funeral establishment permit requirements. Plaintiff is irreparably harmed in these ways each time he is prevented from filing death a certificates and obtaining a burial-transit permits to bury a Muslim whose family and friends are unable to afford the financial burden of hiring a non-Muslim funeral director. Because deaths of such Muslims can and do occur at any time, Plaintiff faces imminent irreparable harm from Delaware's macabre regulatory barrier against access to the Muslim dead constantly, necessitating interim and permanent injunctive relief. Plaintiff is also entitled to compensatory and punitive damages for his constitutional injuries (even though such damages are an inadequate remedy), as well as an award of attorneys' fees pursuant to 42 U.S.C. §1988.

### Count II

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Not Generally Applicable**

189.    Plaintiff incorporates by reference all preceding paragraphs.

190.     Laws burdening religious practice must be of general applicability. Such a law fails the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions. A law that burdens religious exercise must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct.

191.     Defendants' laws and policies have not been evenly enforced, demonstrating that the current attempt at enforcement is designed to target particular religious beliefs and practices.

192.     Defendants have never enforced their laws, policies, and contract provisions in the manner they are currently being enforced against Plaintiff.

193.     Defendants' filing of the regulatory complaint against DMFH, calling for an investigation, demonstrates that Defendants are engaging in an individualized assessment of Plaintiff's actions and the applicability of the law and of any exceptions.

194.     As alleged at length above, Delaware law permits individualized exemptions from the Public Health laws addressing the requirements for the care, handling, and disposition of human remains and the related Vital Statistics laws and regulations governing the filing of death certificates and the issuance of permits for the transportation and disposition of human remains.

195.     As but one example, the Delaware Division of Public Health has promulgated and maintains an express regulation for the consideration and granting of individual exemptions from such requirements to accommodate religious and/or traditional practices. The Division's administrators inexplicably neglected to make this exemption process available to Plaintiff Imam Mahmood when he applied for access to the DelVERS system in order to file death certificates

74

and obtain burial-transit permits for the purpose of providing traditional Muslim funeral rites and burials to Muslims whose family and friends are unable to afford the financial burden of hiring a non-Muslim funeral director.

196.    Moreover, as alleged at length above, Delaware law maintains numerous exemptions to the embalming-related funeral director licensing requirements and funeral establishment requirements of its laws and regulations. These embalming-related requirements serve no rational, legitimate, or important, much less compelling public health or consumer protection purpose; indeed, neither Delaware law nor regulation requires embalming in any case whatsoever.

197.    Even if such a public health, consumer protection, or other rational or legitimate State interest existed, Delaware's application of its laws to plaintiff, as described herein, does not constitute the least restrictive means available to promote any such interest. For example, if Delaware's concern was protecting people from public health risks, a less restrictive means to serve such a purpose would be to designate a properly trained official to (a) grant access to the DelVERS system in order to file death certificates and obtain burial-transit permits upon determination that such access presents no substantial additional risk to any person or the environment, or (b) to file death certificates and issue burial-transit permits to the person responsible for interment in cases in which no licensed funeral director is hired and no substantial additional risk to any person or the environment would be created by doing so.

198.    On information and belief, Delaware has granted exemptions from its public health laws relating to the care and disposition of human remains, and the related provisions of its vital statistics laws, when no licensed funeral director was hired to take responsibility for the

transportation and disposition of the remains, and believes that a reasonable opportunity for discovery will identify the full range of such exemptions.

199.    Plaintiff is irreparably harmed by the discriminatory application, as described above, of exemptions to Delaware's vital statistics, public health, and funeral director laws. Plaintiff is irreparably harmed each time he is prevented from filing a death certificate and obtaining a burial-transit permit to bury a Muslim whose family and friends are unable to afford the financial burden of hiring a licensed funeral director. Because deaths of such Muslims can and do occur at any time, Plaintiff faces imminent irreparable harm from Delaware's macabre regulatory embargo over the Muslim dead constantly, necessitating interim and permanent injunctive relief. Plaintiff is also entitled to compensatory and punitive damages for his constitutional injuries (even though such damages are an inadequate remedy), as well as an award of attorneys' fees pursuant to 42 U.S.C. §1988.

## Count III

### 42 U.S.C. § 1983
### Violation of the Equal Protection Guarantee of the Fourteenth Amendment  to the U.S. Constitution

200.    Plaintiff incorporates by reference all preceding paragraphs.

201.    The Equal Protection Clause of the Fourteenth Amendment states, "No State shall deny to any person within its jurisdiction the equal protection of the laws."

202.    Under the Equal Protection Clause, all persons similarly situated should be treated alike.

203.    The Equal Protection Clause provides a basis not only for challenging legislative classifications that treat one group of persons as superior or inferior to others, but also for contending that general laws and rules are being applied in an arbitrary or discriminatory manner.

204.     The Equal Protection Clause prohibits discrimination on the basis of religion.

205.     Strict scrutiny of a law or regulation applies when a state actor is shown to discriminate against certain individuals based on their membership in a protected class. Protected classes include those based upon suspect distinctions, such as race, *religion,* and alienage, and those impacting fundamental rights. Plaintiff seeks only to celebrate funeral rites and perform burials in the way of his religion for thousands of years. Defendants have denied him this fundamental freedom for no discernable reason other than the identity of his religion, Islam, which is unfamiliar to many Americans and which they have been led to fear and revile by deliberate misinformation. Muslims face unlawful discrimination in this country because certain politicians and political parties have claimed that Muslims are terrorists, that Muslims support terrorism, and/or that Muslims seek to undermine the way of life of non-Muslim Americans. In this case, Defendants have acted intentionally, based upon these misinformed beliefs, to deny Plaintiff the benefits available to similarly situated individuals and groups.

206.     As but one example, the Division of Public Health maintains a process for exemptions from public health laws relating to the care and disposition of human remains to accommodate religious or traditional practices. When Plaintiff Imam Mahmood applied for access to the DelVERS system for the purpose of filing death certificates and obtaining burial-transit permits for the purpose of providing traditional Muslim funeral rites and burials to Muslims whose family and friends are unable to afford the financial burden of hiring a non-Muslim funeral director, he was intentionally excluded from applying for an appropriate religious exemption because he is Muslim and seeks to act on behalf of Muslims and the Mosque, instead of being a member of and seeking to act on behalf of a different religious group more familiar to, or meeting the approval of, the responsible public health/vital statistics

administrators. Plaintiff alleges on information and belief that similar exemptions have been granted to other religious or traditional groups, and believe that a reasonable opportunity for discovery will identify similar exemptions granted to non-Muslims.

207.     The Defendants' discriminatory actions are not justified by any rational, reasonable, legitimate, or compelling state interest, and even if they were, Defendants' actions are not the least restrictive, or even a rational way, to promote any such interest.

208.     As alleged above, Plaintiff is irreparably harmed, and faces the continuing threat of imminent irreparable harm as the direct and proximate result of Defendants' failure to afford him equal protection of the laws as alleged herein, necessitating interim injunctive relief and declaratory and permanent injunctive relief. Plaintiff is also entitled to compensatory and punitive damages (even though damages alone are an inadequate remedy), as well as an award of attorneys' fees pursuant to 42 U.S.C. §1988.

### Count IV

### 42 U.S.C. § 1985
### Conspiracy to Interfere with Civil Rights

209.     Plaintiff incorporates by reference all preceding paragraphs.

210.     Title 42, Section 1985 of the United State Code entitles Plaintiff to damages from the Delaware Board Defendants for their conspiracy to deprive them of their civil rights under federal law.

211.     Each of the Delaware Board Defendants agreed with each other Delaware Board Defendant to cause the filing of a complaint against DMFH alleging Plaintiff's activities constituted "[p]racticing without a funeral establishment permit and a licensed funeral director." Each of the Delaware Board Defendants did so intentionally to interfere with the civil rights of Plaintiff to exercise his religious beliefs and rituals without state interference.  In particular, the

Delaware Board Defendants caused the complaint's filing to threaten regulatory and criminal penalties and/or imprisonment in the event Plaintiff continued to pursue his mission by providing burials to Muslims on a charitable basis. This threat of enforcement was and is intended also to dissuade licensed funeral directors from assisting Plaintiff in carrying out his charitable mission. The Delaware Board Defendants did so because they believe that Plaintiff's mission threatens the Delaware Board's main constituency—licensed funeral directors practicing in Delaware— because each Muslim burial carried out by Plaintiff deprives a Delaware funeral director of an opportunity to profit. Further, each Board member did so with knowledge that there is no way that a practicing Muslim can become a funeral director under Delaware law without sacrificing his or her compliance with Muslim religious strictures against embalming, and with the intention of using this fact against Plaintiff in order to protect their opportunity to profit from the deaths of Delawarean Muslims, to which they believe they are entitled by Delaware law.

212.    On information and belief, the Delaware Board Defendants, acting through Board Secretary Nicholas Picollelli, caused the complaint to be filed by filing it himself, but redacting his name from the document, or by soliciting another person to file it. Such filing or solicitation was an act in furtherance of the Delaware Board Defendants' conspiracy to deprive Plaintiff of his civil rights under federal law.

213.    As alleged herein, the complaint was delivered by letter dated March 30, 2023, as an act in furtherance of the conspiracy. As additional acts in furtherance of the conspiracy, the Defendants further made the complaint known to Delaware funeral directors through discussions at public Board meetings, and, on information and belief, through informal communications within the licensed funeral director community.

214.    The Delaware Board Defendants continued acts in furtherance of the conspiracy by executing a campaign of telephone calls to local hospital morgues to inform them that Plaintiff Imam Mahmood and DMFH are under investigation for unlicensed practice, and instructing the hospitals not to release decedents' remains to Imam Mahmood or to any funeral director who assists him.

215.    The Delaware Board Defendants' conspiracy succeeded in dissuading numerous licensed funeral directors and establishments from assisting Plaintiff, including by causing Mr. Congo and the Congo establishment to terminate their accommodations with Plaintiff, causing him additional expense and preventing his free exercise of his religion as described herein.

216.    Plaintiff accordingly is entitled to compensatory and punitive damages, declaratory relief, and injunctive relief to recompense his injuries and to prevent continuing deprivation of his civil rights, as well as an award of attorneys' fees pursuant to 42 U.S.C. §1988.

### Count V

### Violation of Religious Freedom
### Guaranteed Under the Delaware Constitution

217.    Plaintiff incorporates by reference all preceding paragraphs.

218.    The first section of Delaware's Constitution protects freedom of religion, guaranteeing that no governmental power "shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship, nor a preference given by law to any religious societies, denominations, or modes of worship." Delaware Constitution, Article I, Section 1.

219.    Delaware's Constitution has been interpreted by federal courts to provide at least as much protection to religious freedoms as the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution.

220.     Accordingly, for each of the reasons set forth herein that Defendants' conduct has violated and continues to violate their rights under the United States Constitution, Plaintiff alleges that such conduct also violates his rights under the Delaware Constitution, providing an independent legal basis for declaratory, injunctive, and compensatory relief, as well as punitive damages.

221.     In particular, the actions of the Delaware Board and related actions and/or inaction of Delaware's Public Health and Vital Statistics Officials and administrators, insofar as they have denied Plaintiff access to the systems by which he can certify deaths and obtain burial transit permits and thereby practice his religion in connection with funeral rites and burials of the Muslim dead, violate the Delaware Constitution, Article I, Section 1, by granting favored treatment to religions that do not forbid embalming, and by forcing plaintiffs to engage the services of Delaware-licensed funeral directors trained and experienced in embalming, even though no embalming is required under Delaware law for the burials at issue, impermissibly burdens Plaintiff's free exercise of his religion.  Freedom of religious practice under the Delaware Constitution requires that Plaintiff be afforded access to Delaware's system of online death certification and issuance of burial transit permits, and that the Defendants investigative/enforcement actions and all other harassment of Plaintiff in the practice of Muslim funerary traditions, as described herein, be terminated and enjoined.

222.     Even were Defendants actions alleged herein found not to violate Plaintiff's civil rights under federal law, which should not occur, those actions violate Plaintiff's rights under the Delaware Constitution. Delaware's constitutional protections for freedom of religion are not limited by the Constitution and laws of the United States. *See* Randy J. Holland, State Constitutions: Purpose and Function, 69 Temp. L. R. 989, 1003 (1996) ("Federal Constitutional

standards, however, set only a minimum level of protection. The Declaration of Rights or substantive provisions in a state's constitution may, and often do, provide for broader or additional rights.").  Accordingly, Plaintiff is entitled to declaratory and injunctive relief as described above.

## II. <u>REMEDIES</u>

223.    Plaintiff respectfully requests that the Court declare enforcement of the Delaware Funeral Director Law and related Public Health an Vital Statistics laws against Plaintiff to be unconstitutional and in violation of the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Delaware Constitution; to enter an interim and permanent injunction requiring Defendants to grant Plaintiff access to DelVERS for the purpose of filing death certificates and obtaining the burial-transit permits required for him to lawfully attend to the funeral rites and burials for Muslims; to enjoin further investigative/enforcement activity directed at Plaintiff's funerary practices for purported unlicensed activity under the Delaware FDL and related provisions addressing funeral establishments; and order that the Delaware Board Defendants pay compensatory and punitive damages to Plaintiff in an amount according to proof.


[space intentionally left blank]

224.    Plaintiff respectfully requests an award of attorneys' fees and costs pursuant to 42

U.S.C. § 1988(b), and such other relief as is just and appropriate.

Date: June 21, 2024                                  Respectfully submitted,

                                                     s/Mark M. Billion
                                                     Mark M. Billion
Dwayne Bensing                                       DE Bar No. 5263
DE Bar No. 6754                                      Billion Law
American Civil Liberties Union of Delaware           1073 S. Governors Ave.
100 W. 10th Street, Suite 706                        Dover, DE 19904
Wilmington, DE 19801                                 302.428.9400
302.295.2113

                                                     Attorneys for Plaintiff